**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2506 & 12-4471
_____


PETER BROWNSTEIN,
                                    Appellant

v.

TINA LINDSAY; ETHNIC TECHNOLOGIES


_____

APPEAL FROM THE UNITED STATES
DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 3:10-cv-01581)
District Judge: Honorable Joel A. Pisano
_____

Argued July 10, 2013
_____


Before: GREENAWAY, JR., SLOVITER, and BARRY,
*Circuit Judges*.

(Filed: January 29, 2014)

Jay R. McDaniel, Esq. **[ARGUED]**
McDaniel Law Firm
54 Main Street
Hackensack, NJ 07601
            *Counsel for Appellant*

Thomas S. Howard, Esq. **[ARGUED]**
Kirsch, Gartenberg & Howard
Two University Plaza
Suite 400
Hackensack, NJ 07601-0000
            *Counsel for Appellees*

_____

OPINION
_____


GREENAWAY, JR., *Circuit Judge*.

This case concerns Appellant Peter Brownstein's claim under the Copyright Act seeking a declaratory judgment of joint authorship of an ethnic identification system that he created with Appellee Tina Lindsay, the Lindsay Cultural Identification Determinate ("LCID"). Lindsay purports to have conveyed the copyrights to the LCID to Appellee Ethnic Technologies ("E-Tech"). The contested work is a computer program that implements rules for identifying the ethnicity of proper names for the purposes of direct marketing. In addition to a declaration of his joint authorship, Brownstein

2

sought an accounting of the profits from the ethnic identification system. In response, Appellees counterclaimed to cancel the copyright registrations that Brownstein had received for the system's computer code, which was his contribution to the work.

After the District Court denied summary judgment, the case went to trial. At the end of Brownstein's case, the District Court granted Appellees judgment as a matter of law under Rule 50(a) on Brownstein's joint authorship claim. Fed. R. Civ. P. 50(a). The District Court found that Brownstein's claim was time-barred and that he could not succeed on the merits of his claim based on the evidence adduced at trial. The District Court severed Appellees' counterclaim and later issued an opinion granting summary judgment to Appellees on their counterclaim.

This appeal presents two issues of first impression for our Circuit. The first is when a joint authorship claim under the Copyright Act arises and accrues and the second is whether courts have the authority to cancel copyright registrations. For the following reasons, we hold that an authorship claim arises and accrues when a plaintiff's authorship has been "expressly repudiated". We also hold that courts have no authority to cancel copyright registrations. We will reverse both the District Court's grant of judgment as a matter of law to Appellees and its grant of summary judgment to Appellees on their counterclaim. Also, we will remand the case for a new trial.

## I. BACKGROUND

### A. BROWNSTEIN'S RELATIONSHIP WITH LINDSAY AND E-TECH

3

## 1. The Beginning

Brownstein and Lindsay worked together at Future Prospective Clients, Inc. ("FPCI"), a direct mailing list company, when they began developing the ethnic identification system. FPCI later assumed a new corporate identity, List Services Direct, Inc. ("LSDI").[1] Beginning around December 1993, Lindsay began devising the idea and developing the rules for categorizing names by ethnicity (e.g., by looking at first names, last names, suffixes, prefixes, and geographic location). These rules became known as the Ethnic Determinate System ("EDS") — they could be written out in text, just as one might write out a recipe or driving directions. The system would use this set of rules to run a computer program that would predict the ethnicity of a random list of names from a direct mailing database.

In January 1994, Lindsay enlisted Brownstein to turn her rules into computer code. This required Brownstein to code a number of computer programs that did everything from rewriting a list of names into the proper data format for processing to turning Lindsay's rules into computer code. These programs became known as the ETHN programs.[2] Over the years, Brownstein improved and updated the ETHN programs, with each new generation of programs being a

---

[1] For our purposes, the two are interchangeable.

[2] The programs are called the ETHN programs because they were named ETHN04, ETHN05, etc. The computer code they contained were scripts of written commands that would be read by a computer, which would then execute the commands to perform the functions listed in the code.

distinct work from the previous generation. The combined system of Lindsay's rules and Brownstein's computer code was named the LCID. The result was that Lindsay was the sole author of the EDS, as an independent work of the LCID, Brownstein was the sole author of the ETHN programs, as another independent work of the LCID, and they both had an equal authorship interest in the LCID as a joint work of the EDS and the ETHN programs.

Lindsay and Brownstein did much of their work on the LCID during company time. In June 1996, they incorporated TAP Systems, Inc. ("TAP") to commercialize the LCID. Lindsay and Brownstein were equal owners of TAP and the LCID became known as the TAP system.

Lindsay and Brownstein also decided to register the copyrights to their work for extra security. Lindsay received her first copyright registration for the EDS in February 1996, entitled "An Ethnic Determinant System — Knowledge and Rule/Exception Basis". Copyright Registration No. TXu 730-872 (the "'872 registration"). Later that year, in December 1996, Lindsay received a second copyright registration to protect her improved version of the EDS, which carried the same title. Copyright Registration No. TXu 778-127 (the "'127 registration"). As such, the second registration was for a "derivative work" of the first registration.[3] The difference with the second registration is that she included a copy of Brownstein's ETHN programs as a "deposit copy" for the '127 registration and several fields of the registration

---

[3] As will be discussed *infra*, a derivative work is an independently copyrightable work that is based upon a preexisting work. 17 U.S.C. § 101.

application referenced a "computer process" and "codes" associated with the copyright.[4] Lindsay applied for and secured both copyright registrations on her own, without the involvement of Brownstein, and listed herself as the only author. She then gave Brownstein a copy of the copyright registrations to hold for safekeeping — he claims that he never reviewed the registrations until many years later, shortly before trial.

In the fall of 1996, Lindsay and Tom Raskin, an executive at LSDI, had a confrontation over the copyright registration she had filed earlier that year for the EDS, which Brownstein overheard and recounted in a 1997 affidavit. Raskin demanded that she turn over the copyright registration to him because he believed that LSDI was the rightful owner of her system. Lindsay refused, which infuriated Raskin to no end (and would cause Raskin to later sue Lindsay and Brownstein). Eventually, with tension building between the LSDI management and the duo, and their venture gaining steam, they both left LSDI in June 1997.

Throughout this whole time, Brownstein let Lindsay handle TAP's business affairs. He was so focused on programming code for the LCID that he claims that he did not know of a 1997 software license purportedly granting TAP ownership of the LCID until 2009.

**2. The Progress of TAP**

---

[4] As will also be discussed *infra*, a deposit copy must be submitted with most registrations in order to provide an example of the registered work. 17 U.S.C. §§ 407(a), 408(b).

Over the course of several years, Lindsay executed a number of agreements to form new business entities to promote the LCID and to transfer ownership of the LCID to those entities.

On June 1, 1997, Lindsay unilaterally attempted to grant TAP ownership of the LCID (the combined system of her rules and Brownstein's ETHN programs). (App. 663 (Software License Agreement, June 1, 1997).) By doing so, Lindsay had hoped that TAP would own the LCID and be able to exploit it freely. Lindsay was the only signatory to that 1997 Software License — she signed both as the "Copyright Holder" of the LCID and the agent of TAP. Brownstein was not a signatory to the license, nor was he asked to be one.

Later that year, Lindsay and Brownstein decided to partner with one of their former employers, Consumers Marketing Research, Inc. ("CMR"), to create E-Tech, a joint venture between the two companies. A September 26, 1997 License Agreement (the "1997 Agreement") was signed only by Linsday and CMR's executive, Ginger Nelson. The 1997 Agreement listed Lindsay and Brownstein as executive officers of the new venture (which was just called the "LLC" until a superseding agreement in 2000 formally named the venture "Ethnic Technologies, LLC"). (App. 631.) The parties agreed to combine CMR's technology with the LCID (which was referred to as the "TAP SYSTEM"), the combination of which would be called the E-Tech system. The agreement also acknowledged that TAP owned the LCID. The superseding December 28, 2000 Agreement (the "2000 Agreement") largely mirrored the 1997 Agreement, except that it formally called the joint venture "Ethnic Technologies, LLC" and the combined system "E-Tech".

(App. 639.) Lindsay and Nelson were also the only signatories to the 2000 Agreement, although Brownstein initialed three corrections made to the agreement. (App. 640-41.) Thus, while Brownstein can be imputed with knowledge of these agreements as a 50% owner of TAP and an executive of E-Tech, he never signed the agreements.

As an E-Tech executive, Brownstein executed five licensing agreements to E-Tech customers between 2000 and 2005. (App. 695-702 (2001 Agreement with Edith Roman Associates); App. 702-06 (2002 Agreement with Wells Fargo); App. 707-13 (2002 Agreement with Penn Media); App. 714-20 (2003 Agreement with Merkle Data Technologies); App. 721-27 (2005 Agreement with Central Address Systems, Inc.).) One of these agreements acknowledged that the E-Tech system was the "exclusive property" of E-Tech, while the four others acknowledged that E-Tech "owns all rights, including copyrights" to the E-Tech system.

### 3. The Aftermath

The remainder of Brownstein's relationship with E-Tech was marred by three lawsuits: the first initiated by LSDI in federal court, the second initiated by him in New Jersey state court, and the third initiated by him in federal court. Although Brownstein did not sign any of the aforementioned licensing agreements (including the 1997 Software License, 1997 Agreement, and 2000 Agreement), he did sign the two settlement agreements related to litigation with LSDI in 1998 and the New Jersey state court oppressed shareholder lawsuit in 2009.

In 1998, LSDI and Raskin (Lindsay and Brownstein's former employer) sued TAP in the District of New Jersey over its use of the LCID. That action eventually settled in September 1998, with LSDI retaining rights to the ETHN programs written up to that point (and any derivative works or modifications thereof), referred to as the "LSDI Program", and TAP retaining the rights to the EDS (and any derivative works or modifications thereof).[5]

The September 18, 1998 Settlement Agreement (the "1998 Settlement Agreement") from the LSDI litigation stated 1) that Lindsay and Brownstein would not claim rights to certain computer programs and derivatives or modifications thereof (the "LSDI Program") and 2) that they had rights to Lindsay's copyrights. (App. 2768-69 (Settlement Agreement ¶¶ 1-3).) Notably, the 1998

---

[5] We need not determine whether post-1998 versions of the ETHN programs are derivative works of the LSDI Program since that issue is not before us on appeal.

Settlement Agreement equated the EDS with the LCID ("EDS which may be called LCID") — the District Court in this litigation found this to be a critical fact.[6] (App. 2769 (Settlement Agreement ¶ 3).)

In May 2009, Brownstein left E-Tech on bad terms. He filed an oppressed shareholder lawsuit against Lindsay and E-Tech in the Superior Court of New Jersey. This litigation settled in May 2010. During this period, Brownstein filed for his own copyright registrations in December 2009, which covered his ETHN programs.

The May 25, 2010 Settlement Agreement (the "2010 Settlement Agreement") from the New Jersey state court oppressed shareholder lawsuit 1) stated that the terms of the settlement would not affect the lawsuit leading to this appeal, which was then pending, 2) forced Brownstein to relinquish his interests in E-Tech, and 3) released the defendants (Lindsay and E-Tech) and Brownstein from related claims. (App. 519-24 (Settlement Agreement ¶¶ 2.6, 3.3, 5.1.1, 5.1.2).) Specifically, this 2010 Settlement Agreement vitiated Brownstein's "right, title, and interest" as a "shareholder, officer, employee or director in TAP or as manager, partner, member, officer, director or employee of E-Tech". (App. 520-21 (Settlement Agreement ¶ 2.6).)

Nevertheless, it was not until March 2010 that Brownstein took affirmative steps to protect his joint authorship of the LCID by filing the instant lawsuit seeking

---

[6] As will be noted *infra*, the District Court's assumption was incorrect because the 1998 Settlement Agreement could not define the scope of Brownstein's and Lindsay's copyrights.

declaratory judgment of his authorship of the LCID (and, by virtue thereof, his ETHN programs) against Lindsay and E-Tech. This lawsuit was instigated by Lindsay's 2010 deposition testimony for the New Jersey oppressed shareholder lawsuit, in which she confirmed what Brownstein had not intuited until then: She had submitted Brownstein's ETHN programs with her second copyright registration, the '127 registration, and might be claiming sole authorship of the LCID as a result. In total, he waited 14 years from the date of Lindsay's copyright registrations, 1996, to file a lawsuit.

## B. THE DISTRICT COURT PROCEEDINGS

On March 22, 2010, Brownstein filed his complaint in this instant action, which sought a declaratory judgment of joint authorship of the LCID, an accounting of the profits from his joint authorship of the LCID, and replevin of physical copies of the ETHN programs allegedly kept at E-Tech's offices. Lindsay and E-Tech filed a counterclaim to cancel Brownstein's 2009 copyright registrations to the ETHN programs.

In February 2012, a jury trial was held in this action — the only witnesses called were Brownstein and Lindsay. Brownstein testified first; Lindsay was then called and Brownstein's counsel conducted his direct examination. Before Appellees' counsel called Lindsay as their own witness, Appellees moved under Rule 50 for judgment as a matter of law. The following day, the District Court heard oral argument on the motion and ruled from the bench in Appellees' favor.

**1. The Rule 50(a) Ruling from the Bench (Brownstein's Claim for Joint Authorship of the LCID)**

The District Court granted Rule 50(a) judgment as a matter of law in favor of Appellees on Brownstein's joint authorship claim.[7] Foremost, the basis of the District Court's ruling was that the statute of limitations under the Copyright Act had run since Brownstein had adequate notice of his authorship claim more than three years prior to filing his complaint. (App. 1127-34 (Trial Tr. 333:9-340:3).) As the District Court framed it, "[W]hy did [Brownstein] wait 14 years and [until after] all of the other ensuing events without saying anything about it?" (App. 1130 (Trial Tr. 336:15-16).)

Under the "discovery rule", the District Court found that there were sufficient "storm warnings" to Brownstein that Lindsay was claiming sole authorship of the LCID, as far back as 1996. Finding that Lindsay's act of registering her copyrights started the statute of limitations running, the District Court explained that "there is evidence that the injurious act [of Lindsay applying for copyright registration] was actually known as far back as 1996." (App. 1131 (Trial Tr. 337:13-21).) The District Court found it dispositive that Brownstein not only had the copyright registrations in his possession but that he also had "actual knowledge" of the series of agreements and the 1996 argument between Lindsay and Raskin, all of which showed that Lindsay was holding herself out as the sole author of the LCID. (App. 1133 (Trial Tr. 339:10-24).) In particular, the District Court found that Brownstein had conceded that Lindsay's copyright

---

[7] There was also the replevin claim that the District Court dismissed, but Brownstein has not appealed this decision.

registrations covered the LCID because he signed the 1998 Settlement Agreement, which the District Court paraphrased as stating that "Tina Lindsay obtained a Certificate of Registration from the copyright office in 1996 for EDS, which may be called LCID." (App. 1132 (Trial Tr. 338:5-9).)

The District Court reasoned that "every . . . piece of evidence in this case contradict[ed]" Brownstein's testimony that he had no clue that Lindsay was claiming to be the sole author of the LCID (including his ETHN computer programs) until she gave her 2010 deposition. (App. 1133 (Trial Tr. 339:5-9).) From this, the District Court concluded not only that Brownstein had constructive knowledge that Lindsay considered herself the sole author but also that he had actual knowledge of it. The District Court also concluded that there was no evidence that Lindsay ever considered Brownstein a co-author of the LCID.

The District Court further ruled that Brownstein was not a co-author of the LCID or of his computer programs because "there is no evidence to support this claim of co-authorship in the record." (App. 1133 (Trial Tr. 339:5-12).) Therefore, the District Court reasoned, even if he was not barred by the discovery rule and the statute of limitations, his claim would still fail on the merits.

## 2. The Summary Judgment Opinion (Lindsay and E-Tech's Counterclaim to Cancel Brownstein's Copyright Registrations)

After it granted Appellees' Rule 50 motion on Brownstein's authorship claim, the District Court issued an opinion granting summary judgment on Appellees' counterclaim to cancel Brownstein's two copyright

13

registrations.  The District Court found that it had authority to cancel Brownstein's copyright registrations because the "threshold determination as to the ownership of the works at issue is to be made by the Court, as [Appellees] seek to invalidate the registration because [Brownstein] had no right to register the work, not because of some regulatory defect." (App. 12-13 (Summ. J. Op. at 4-5).)  The District Court proceeded to cancel Brownstein's copyright registrations because it had "previously found . . . that [Brownstein's] co-authorship claim was without merit" in deciding the Rule 50 motion.  (App. 13 (Summ. J. Op. at 5).)  Thus, it concluded that Brownstein had no authorship interest in the LCID or his ETHN programs and that all of the LCID and its derivatives were created for TAP and owned exclusively by TAP.  (App. 13 (Summ. J. Op. at 5).)  The District Court noted that, "specifically, the 1997 and 2000 agreements[] refer to the relevant programs as belonging exclusively to TAP."  (App. 13 (Summ. J. Op. at 5).)  The District Court also found that the 2010 Settlement Agreement from the New Jersey oppressed shareholder lawsuit relieved Brownstein of any "right, title and interest" in TAP and E-Tech, including the LCID, which it found that TAP and E-Tech owned.  (App. 13 (Summ. J. Op. at 5).)

## II.   STATEMENT   OF   JURISDICTION   AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367.  We have jurisdiction under 28 U.S.C. § 1291.

Our review of a judgment as a matter of law under Rule 50(a) is plenary.  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996).  "A motion for judgment as a matter

14

of law under Federal Rule [of Civil Procedure] 50(a) 'should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law.'" *Id.* (quoting *Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987)).

Our review of a district court's grant of summary judgment is plenary. *William A. Graham Co. v. Haughey*, 568 F.3d 425, 437 (3d Cir. 2009). Summary judgment may only be granted if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. ANALYSIS

Our Circuit has rarely had occasion to venture into the area of joint authorship under the Copyright Act. In *Andrien v. Southern Ocean County Chamber of Commerce*, 927 F.2d 132 (3d Cir. 1991), we touched upon the issue in determining whether a printer's contribution to the printing of a map gave it joint authorship of the map or whether such contributions through printing were works for hire. This is the first time that our Circuit has faced a joint authorship claim squarely on the merits.

In granting Appellees' Rule 50 motion, the District Court decided two factual issues. The first issue was whether Brownstein was a co-author of the LCID. If he was deemed a co-author, the second issue was whether his joint authorship claim was barred by the statute of limitations because he was put on inquiry notice that Lindsay had disclaimed his co-authorship. In deciding both of these issues, the District

15

Court erred because these were factual determinations that should have been left to the jury. When viewed in the light most favorable to Brownstein, the evidence presented at trial could allow him to succeed on his joint authorship claim.

In granting summary judgment on Appellees' counterclaim, the District Court determined that it had the authority to invalidate Brownstein's copyright registrations. For the reasons that follow, the District Court should not have granted summary judgment on the counterclaim because it had no authority to cancel Brownstein's copyright registrations.

We will address each of these three issues in turn — whether Brownstein was a co-author of the LCID, whether his claim is barred by the statute of limitations, and whether the District Court had authority to cancel Brownstein's copyright registrations.

## A. JOINT AUTHORSHIP

In order to reach the issue of when Brownstein's authorship claim arose and accrued, we must first determine if he was a co-author of the LCID.

### 1. The LCID as a Joint Work

The issue at the root of this case is whether Brownstein is a co-author of the LCID, which depends on whether the LCID is a joint work. When two or more people create a "joint work", they become co-authors and co-owners of the work, each entitled to "undivided ownership in the entire work". 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.03 [hereinafter *Nimmer on Copyright*]; *see* 17

16

U.S.C. § 101 (defining a "joint work"); *Andrien*, 927 F.2d at 136. This ownership interest vests from the act of creating the work, rather than from any sort of agreement between the authors or any act of registration with the Copyright Office.

For two or more people to become co-authors, each author must contribute some non-trivial amount of creative, original, or intellectual expression to the work and both must intend that their contributions be combined. 1 *Nimmer on Copyright* § 6.07; *see Gaiman v. McFarlane*, 360 F.3d 644, 658-59 (7th Cir. 2004). The components must also be "inseparable or interdependent" parts of a whole but each co-author's contribution need not be equal for them to have an equal stake in the work as a whole. 17 U.S.C. § 101; 1 *Nimmer on Copyright* § 6.03. Thus, if Person A writes lyrics to a song and intends for a composer to write the score, Person B who writes the score becomes a co-author in the work. *See Gaiman*, 360 F.3d at 659 (providing the example of two co-authors, one a professor with brilliant ideas and the other an excellent writer); *Childress v. Taylor*, 945 F.2d 500, 504 (2d Cir. 1991) (holding that a lyricist and composer of a song were co-authors "even though the lyricist wrote the words before he knew the identity of the composer who would later write the music").

At oral argument, Appellees conceded that Brownstein and Lindsay were co-authors of the LCID up until its 1997 iteration. Oral Arg. at 17:10-19:00, 21:21-28 (July 10, 2013). This concession means that Appellees admit that Brownstein contributed a non-trivial amount of creative expression to the LCID through his work on the ETHN programs and that Lindsay intended for the EDS to be combined with the computer code he drafted to form the LCID. Moreover, this framework concedes that the EDS and the ETHN programs

17

are interdependent works, which comports with Lindsay's assertions. In both the 1997 Software License and her testimony at trial, she admitted that her rules and Brownstein's code were inseparable. (App. 1050 (Trial Tr. 256:1 ("[The] LCID had to have programs.")).) In Schedule A of the license, she wrote that the "series of computer programs" and "system data" of the LCID were "irrevocably entwined". (App. 668 (Software License Agreement, Schedule A).)

Importantly, this concession also means that Appellees admit that the ETHN programs were not works for hire, as Lindsay had insinuated in some of her testimony at trial. The District Court also concluded that the ETHN programs were works for hire in granting summary judgment on Appellees' counterclaim, which was an argument that Appellees advanced in their answer and which we find to be in error.

To analogize here, Lindsay wrote the lyrics, while Brownstein composed the score. The exception to this joint authorship rule is the "work for hire" rule, where a collaborator creates his contribution to the work as part of his employment or for a commission.[8] 17 U.S.C. § 201(b); 1 *Nimmer on Copyright* § 5.03. In such a case, authorship inures to the employer or commissioner. 17 U.S.C. § 201(b).

---

[8] A classic example of a work made for hire is a magazine article written by an editor employed by the magazine's company. Unless they agree otherwise, the editor's employer, the magazine's company, owns the copyright to his article, despite the fact that he created the article with his own intellectual creativity.

18

A work for hire requires that the work be made by an employee within the scope of his or her employment or that the work be commissioned. 17 U.S.C. § 101; *see 1 Nimmer on Copyright* § 5.03; *Marco v. Accent Publ'g Co.*, 969 F.2d 1547, 1549-50 (3d Cir. 1992); *see also Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 48 (1st Cir. 2008). At trial, Lindsay claimed that she directed Brownstein on how to turn her rules into computer code. (App. 1051 (Trial Tr. 257:19-22 ("At my direction. I told him exactly what to write.")).) On the other hand, Brownstein had to use his own intellectual creativity to select the computer commands to use. He controverted Lindsay's testimony on the stand when he testified that he automated Lindsay's manually inputted list of rules and names, which gave Brownstein "[q]uite a bit [of discretion]" in how he coded the ETHN programs. (App. 910 (Trial Tr. 116:8-10).)

By every indication, and given Appellees' concession, Brownstein's computer programs were not works for hire. 17 U.S.C. § 201(b). Brownstein was both an officer and shareholder of TAP and an officer of E-Tech. He was not an employee of TAP or E-Tech; nor was he commissioned to write the code by TAP or Lindsay. Most importantly, he was not compensated for the express purpose of writing code for them.

## 2. The Effect of Lindsay's and Brownstein's Copyright Registrations

Pivotal to this case is distinguishing an author's interest in the copyright to his work from the registration of his work. A "copyright", as a right, vests immediately upon the creation of the work. 17 U.S.C. § 201(a). For this reason, a copyright must not be confused with the act of registering

19

that right.  Registration serves primarily to create a record of the creation of the work and it also allows the author to bring civil claims under the Copyright Act.  17 U.S.C. § 411(a); 2 *Nimmer on Copyright* § 7.16.

With few exceptions, a deposit copy must be submitted with an application for copyright registration.  17 U.S.C. §§ 407(a), 408(b).  A deposit copy does not necessarily limit the copyrightable work itself.  2 *Nimmer on Copyright* § 7.17.  Here, a deposit copy means that Lindsay sent a physical printout of Brownstein's code to the Copyright Office for safekeeping (and was only sent a deposit receipt in return), which would serve an "archival function" in the event of infringement and help elucidate her copyrightable work.  *Id.*

**a. Lindsay's Copyrights and Copyright Registrations**

Due to the District Court's conflation of the EDS and the LCID, which are distinct works with distinct copyrights, it was misled into finding that Lindsay's copyright registrations covered the entire LCID, including Brownstein's ETHN programs.  This false premise then led the District Court one step further to conclude that Lindsay could unilaterally transfer ownership of the LCID through the trio of licensing agreements that she executed.  The District Court largely assumed that her copyright registrations covered the entire LCID because Brownstein's ETHN programs were included as a "deposit copy" with her second registration.  But the District Court's assumption is belied by the copyright registrations themselves and the law undergirding the registration process.  Lindsay's copyright registrations only cover the EDS.

20

Lindsay's registrations did not extend to the LCID as a whole or the ETHN programs. Notably, Lindsay's first registration was entitled "An Ethnic Determinant System — Knowledge and Rule/Exception Basis", which unambiguously refers to the EDS, her system of rules. Her second registration had the same title and was marked as a derivative work of the first, so it, too, only covered the EDS. The most significant difference between her two registrations is that the second registration included Brownstein's ETHN programs as the deposit copy and described the EDS as "[a] computer system process and data rules" in the Nature of Authorship field of the registration application. She also wrote "[a]dditional ethnic categories, additional rules, names, codes . . . [d]escription of computer process included" in another field of the second registration. Nowhere, though, did she write "ETHN programs" in the registration. Accordingly, her registrations could not claim ownership of the ETHN programs simply based on the contents of the deposit copy.

The District Court's reliance on the deposit copy as an indication of the second registration's scope was also misguided. Lindsay, herself, admitted as much at trial. She testified that the deposit copy did not reflect the scope of her copyrights or authorship, explaining that the deposit copy of the ETHN programs was only meant to provide "an example" of how the EDS would be implemented, not to claim ownership of Brownstein's programs. (App. 1049 (Trial Tr. 255:1-4).)

Thus, the fact that Lindsay submitted Brownstein's code in the form of the deposit copy does not establish that she held a copyright to his ETHN programs or the LCID as a whole. Since Brownstein, alone, wrote the code, the only

21

rights Lindsay could have had to his code would flow through the LCID as a joint work with her rules. Further, even if her registrations covered the LCID and were entitled "The LCID, Including the ETHN Programs", that act would not vest exclusive ownership of the LCID in Lindsay. Brownstein would remain a co-author and co-owner because copyright registration does not establish the copyright, which attaches at the moment of creation. Consequently, Lindsay's copyright registrations, if anything, are merely placeholders for the indivisible joint rights she inherently had in the EDS and the LCID with Brownstein.

### b. Brownstein's Copyrights and Copyright Registrations

As mentioned above, Brownstein had copyrights exclusively in his ETHN programs as an independent work and non-exclusively in the LCID as a co-author. In addition, he also had copyrights to whatever new generations of the ETHN programs and LCID that he created as "derivative works" of his first set of ETHN programs and the LCID. Therefore, although LSDI retained rights to the ETHN programs that were considered the "LSDI Program" in the 1998 Settlement Agreement, the subsequent generations of ETHN programs that Brownstein developed remained under his ownership because they were derivative works of the LSDI Program. Brownstein's 2009 copyright registrations would, therefore, cover any post-1998 generations of the ETHN programs that were not covered by the 1998 Settlement Agreement with LSDI.

### 3. Derivative Works of the LCID

At oral argument, Appellees contended that the post-1997 versions of the LCID are derivative works and that,

22

therefore, Brownstein has no rights to these improved versions of the LCID. Appellees are correct in one respect and wrong in another: The post-1997 versions of the LCID may indeed be derivative works but Brownstein retains an interest in the post-1997 versions of the LCID insofar as they are based on any version of the LCID to which he is a co-author. It is possible that the post-1997 versions of the LCID continued to employ the code created by Brownstein, but such a determination would require additional factual development at trial.

Derivative works are works that build upon and improve a previous work, such as a remix of an old song. 17 U.S.C. § 103. While the original work may be copyrightable, a derivative work is copyrightable on its own basis. *Id.*; 1 *Nimmer on Copyright* § 3.04. Derivative work protection only extends to those parts of the derivative work that are novel beyond the original work and the author or authors of the underlying work retain their rights to their original work. *See Dam Things from Denmark, a/k/a Troll Co. ApS v. Russ Berrie & Co.*, 290 F.3d 548, 563 (3d Cir. 2002).

A copyright is better described as a bundle of rights: the right to reproduce the copyrighted work, the right to prepare derivative works from the copyrighted work, and the right to perform or display the copyrighted work. 17 U.S.C. § 106; *see Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007). Thus, the author has the exclusive right to produce derivative works. *See Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 212-13 (3d Cir. 2002); *Dam Things from Denmark*, 290 F.3d at 563-64. If the original work is copyrightable, then the original author or authors must consent to the creation of a derivative work by a third party — unauthorized creation of a derivative work, which

incorporates the original work, constitutes an infringement of the underlying work. 17 U.S.C. § 106; 1 *Nimmer on Copyright* § 3.04; *Dun & Bradstreet Software Servs., Inc.*, 307 F.3d at 212-13; *Dam Things from Denmark*, 290 F.3d at 563-64.

As a result, even if Brownstein is not a co-author of some of the derivative versions of the LCID, he remains the co-author of the underlying work and has an ownership interest in derivative versions of the LCID to the extent that they incorporate the underlying work. The extent of Brownstein's authorship and ownership of these derivative works is a factual question that must be decided by a jury.

**4. The License and Settlement Agreements**

Having defined the inherent copyrights of Lindsay and Brownstein, the next question is what rights were conveyed by the series of license and settlement agreements. Some agreements purport to grant licenses, while some purport to transfer ownership, but it is not at all clear which agreements accomplish what.

With respect to licensing a joint work, each co-author is entitled to convey non-exclusive rights to the joint work without the consent of his co-author. 1 *Nimmer on Copyright* § 6.10. *See Davis*, 505 F.3d at 98-100. The only caveat is that the licensing author must account to his co-author for his fair share of profits from any non-exclusive license. 1 *Nimmer on Copyright* § 6.12. If a co-author attempts to convey exclusive rights, his co-author can convey the same exclusive rights — in effect, such an exclusive license becomes a non-exclusive license. *Id.* § 6.10; *see Davis*, 505 F.3d at 100-01 ("A co-owner may grant a *non-exclusive*

24

license to use the work unilaterally, because his co-owners may also use the work or grant similar licenses to other users and because the non-exclusive license presumptively does not diminish the value of the copyright to the co-owners."). Accordingly, the only way for truly exclusive rights to be conveyed to a joint work is for all co-authors to consent to such an exclusive conveyance. As with tenants in common of real property, a co-author can transfer or assign the rights to his ownership interest in the joint work, but this does not affect the ownership rights of his co-author. 1 *Nimmer on Copyright* § 6.11; *Davis*, 505 F.3d at 99-100.

With respect to transferring the ownership of a joint work, a co-author cannot transfer the ownership interest of his co-author. The Copyright Act's "statute of frauds" requires that any transfer of an ownership interest must be signed and in writing. 17 U.S.C. § 204(a); *see Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827 (3d Cir. 2011).

Due to Appellees' concession that Brownstein was a co-author of the LCID through 1997, Lindsay could not have transferred ownership of the LCID before 1998 without Brownstein's consent in a writing with his signature. Even if Lindsay's registrations covered the entire LCID, she would have had no authority to convey an exclusive license to the joint work of the LCID without Brownstein's consent and could only have assigned the rights to her own ownership interest in the LCID. 1 *Nimmer on Copyright* §§ 6.10, 6.11; *see Davis*, 505 F.3d at 99-100.

Under these facts, Lindsay could have only conveyed a non-exclusive license to the LCID to TAP (and, subsequently, to E-Tech). Such non-exclusive licenses to the LCID would have no effect on Brownstein's copyrights and ownership

25

interest in his ETHN programs and the LCID. Accordingly, the only set of rights to which Lindsay could have conveyed an exclusive license or transferred ownership on her own would be to the EDS, of which she was the sole author. If Lindsay did transfer her ownership of the EDS to TAP, that, too, would not have disturbed Brownstein's rights.

Since the 1997 Agreement and 2000 Agreement both emanate from the rights conveyed in the 1997 Software License, those two agreements rise and fall with the 1997 Software License. Since the software license did not transfer Brownstein's ownership interest in the LCID as a joint work, neither could the 1997 Agreement or 2000 Agreement. The 2010 Settlement Agreement did divest Brownstein of any interest he had in TAP and E-Tech. But, if TAP and E-Tech never had exclusive rights to Brownstein's ETHN programs as part of the LCID, then Brownstein could not be divested of those rights via the 2010 Settlement Agreement. Moreover, the 2010 Settlement Agreement only quashed Brownstein's "right, title, and interest" as a "shareholder, officer, employee or director in TAP or as manager, partner, member, officer, director or employee of E-Tech". It says nothing specifically about his rights as co-author of the LCID or sole author of the ETHN programs.

In sum, Brownstein's copyrights and ownership interest in his ETHN programs (and, by virtue thereof, the LCID) were not affected by the series of agreements, except to the extent that the 1998 LSDI Settlement Agreement abrogated his ownership of the pre-1998 generations of the ETHN programs, the "LSDI Program".

26

**B. THE STATUTE OF LIMITATIONS**

Even though Brownstein is a co-author of the LCID through 1997 and possibly a co-author of derivative versions of the LCID created thereafter, an open question remains about whether the statute of limitations has run on his authorship claim. The statute of limitations under the Copyright Act is three years for all civil actions.[9] 17 U.S.C. § 507(b). Here, Brownstein must show that his joint authorship claim did not begin to accrue until March 22, 2007, at the latest.

**1. Inquiry Notice of Brownstein's Authorship Claim**

Once Brownstein was on inquiry notice of his authorship claim, his cause of action began to accrue and the statute of limitations began to run. Deciding when Brownstein was on inquiry notice of his authorship claim depends on two determinations: 1) when a cause of action first arose and 2) when he should have known that a cause of action had arisen. In our Circuit, the discovery rule governs the second determination, while we adopt the express repudiation rule from our sister circuits to govern the first.

---

[9] Brownstein argues that the statute of limitations does not even apply since Lindsay's copyright registrations and agreements only related to the EDS and Brownstein is only seeking a declaration that he is a co-author of the LCID. (Appellant's Reply Br. 11-15.) While it is true that Lindsay's testimony at trial is internally inconsistent, Lindsay is still asserting in her counterclaim that she is the sole author of the LCID, which contests Brownstein's joint authorship of the LCID.

### a. The Discovery Rule

We follow the "discovery rule" in determining when a cause of action begins to accrue. The discovery rule is a general inquiry notice rule, which states that a claim accrues when the plaintiff discovers or should have discovered with "due diligence" that his rights had been violated. *William A. Graham Co.*, 568 F.3d at 438. In *William A. Graham Co.*, we extended the discovery rule to copyright actions, noting that eight of our sister circuits had done the same. *Id.* at 433-37. We held that a plaintiff would be able to discover his injury with due diligence if there were "storm warnings" which gave the plaintiff "sufficient information of possible wrongdoing to place [him] on inquiry notice . . . of culpable activity." *Id.* at 438 (internal quotation marks omitted). The discovery rule also holds that the clock only starts running once a cause of action arises since a plaintiff cannot experience storm warnings of a violation until his rights have been violated. *Id.* at 438-39. Consequently, prospective plaintiffs have no duty to investigate future causes of action. *Id.* at 439.

### b. Express Repudiation

Since *Graham* does not establish when a cause of action arises for declaration of authorship, we must turn to our sister circuits for guidance.[10]

---

[10] As of 1996, the Ninth Circuit observed that "[t]here is a surprising lack of precedent on the question of when a cause of action claiming co-ownership of a copyright accrues." *Zuill v. Shanahan*, 80 F.3d 1366, 1370 (9th Cir. 1996). Likewise, as of 2005, the Eastern District of Michigan commented that "[t]here is surprisingly sparse precedent on

28

The Ninth Circuit, Seventh Circuit, and Second Circuit have adopted an "express repudiation" rule, such that a joint authorship claim arises and an author is alerted to the potential violation of his rights when his authorship has been expressly repudiated by his co-author. *See Zuill*, 80 F.3d at 1370-71; *Gaiman*, 360 F.3d at 653; *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013). Thus, in assessing the accrual of a joint authorship claim, we will apply the discovery rule to the express repudiation rule. Fusing these two concepts, the discovery rule will only apply once a plaintiff's authorship has been expressly repudiated since he can only be on inquiry notice once his rights have been violated.

This express repudiation rule spawned from a Ninth Circuit case, *Zuill v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996). Since *Zuill*, only a smattering of circuit cases have endorsed the rule. *See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG.*, 510 F.3d 77, 88-89, 91 (1st Cir. 2007); *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389-90 (6th Cir. 2007). Similar to the discovery rule, the express repudiation rule looks for evidence that a co-author has acted adversely to the plaintiff's status as a co-author.[11] *See Gaiman*, 360 F.3d at 653; *Zuill*, 80 F.3d at

---

the question of when a cause of action claiming co-ownership of a copyright accrues." *Diamond v. Gillis*, 357 F. Supp. 2d 1003, 1006 (E.D. Mich. 2005).

[11] In *Zuill*, the plaintiffs' joint authorship was expressly repudiated when the co-creator of Hooked on Phonics made declarations that he was the "sole" owner of the contested copyrights in a compensation contract reviewed by the putative co-creators of the music and the co-creators saw a

1370-71; *Gary Friedrich Enters., LLC*, 716 F.3d at 317-19; *see also Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000); *Merchant v. Levy*, 92 F.3d 51, 53, 56 (2d Cir. 1996). Many of these cases analogize co-authors of copyrights to tenants in common of real property. *See Zuill*, 80 F.3d at 1370; *Gaiman*, 360 F.3d at 654; *Davis*, 505 F.3d at 98-99.

Applied here, Brownstein's injury occurred whenever Lindsay expressly repudiated his joint authorship of the LCID. This required that Lindsay do something that communicated not merely that she is the author, but that she is the *sole* author or that Brownstein is not a co-author.[12] For

---

published version of the work with the defendant listed as the only author. 80 F.3d at 1368. In *Gaiman*, the plaintiff's joint authorship claim was expressly repudiated when the defendant sent a letter to him which stated that "all rights . . . shall continue to be owned" by the defendant's company. 360 F.3d at 652. Unlike Brownstein, the plaintiffs in those cases had no ownership interest in the entity that was claimed to own the putative copyrights and they were directly shown a document with a declaration of the defendants' sole authorship.

[12] A critical nuance is that Lindsay's assertion of her sole authorship to unspecified copyrights in an agreement is not an express repudiation of Brownstein's co-authorship of the LCID and his sole authorship of his ETHN computer programs. If Lindsay's copyrights did not cover the joint work of the LCID but, instead, only the EDS, then her declarations as sole author of her copyrights would have said nothing about Brownstein's authorship of his computer code.

instance, this would occur if Brownstein became aware that she was claiming that she was the sole author of the LCID in an agreement or if Brownstein overheard a conversation where Lindsay said that she commissioned Brownstein to do the work for her as a work for hire. Or, as in *Gaiman* and *Zuill*, this would happen if Lindsay directly sent Brownstein a letter which stated that she was the sole author of the LCID. Express repudiation could also occur if Lindsay was exploiting the LCID without remuneration to Brownstein. *See, e.g.*, *Gary Friedrich Enters., LLC*, 716 F.3d at 318-19; *Cambridge Literary Props., Ltd.*, 510 F.3d at 91.

The District Court considered the date of express repudiation (which it characterized as the date of injury) to be the date that Lindsay registered her copyrights since, in listing herself as the only author of the registration, she was implicitly disclaiming Brownstein's joint authorship. (App. 1131 (Trial Tr. 337:13-15 ("In my view, the injurious act defined by the statute actually occurred upon the registration of the copyright.")).) This stretches the meaning of express repudiation too thin. The act of registering a copyright does not repudiate co-authorship; put differently, the way to expressly repudiate your co-author's authorship is not to register the copyright in your name.

As one of our sister circuits has held, a copyright registration, standing alone, does not serve as repudiation of joint authorship because co-authors are not expected to investigate the copyright register for competing registrations. *See Gaiman*, 360 F.3d at 654-55. *But see Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir. 1997) (holding that copyright registration puts the world on constructive notice of ownership); *Diamond v. Gillis*, 357 F. Supp. 2d 1003, 1007 (E.D. Mich. 2005)

31

(holding that registration of a song qualified as express repudiation). In *Gaiman*, the Seventh Circuit held that the purpose of a copyright registration is "not to start the statute of limitations running" because it is not adverse to a co-author's interest in the joint work. 360 F.3d at 653-54.

The peril of the District Court's rationale is apparent: A challenger to a plaintiff's authorship could surreptitiously apply for copyright registration of the plaintiff's work to start the statute of limitations running and, if the plaintiff did not discover the registration until three years thereafter, the plaintiff's authorship would be nullified.

Appellees contend that blanket statements in some of the agreements declaring Lindsay as the sole author of the LCID expressly repudiated Brownstein's authorship rights. We disagree. The more apt inquiry is whether any statement in the agreements was hostile or adverse to Brownstein's authorship rights. *See Gaiman*, 360 F.3d at 654; *Zuill*, 80 F.3d at 1370. For repudiation to be express, it must be plain. *See Aalmuhammed*, 202 F.3d at 1230-31. A copyright holder should not be required to investigate every whisper and rumor that another has declared himself the author of his copyrighted work. *See Gaiman*, 360 F.3d at 654-55. A whisper or rumor also does not stir up the type of "storm warning" that would put an author on inquiry notice. It follows that, if an action is not hostile to an author's rights, it may not be plain that his authorship rights have been repudiated.

There are several potential sources of express repudiation at play: Lindsay's copyright registrations, the 1996 argument between Lindsay and LSDI's Raskin, the trio of license agreements (the 1997 Software License, the 1997

32

Agreement, and the 2000 Agreement), the settlement agreements (the 1998 Settlement Agreement and the 2010 Settlement Agreement), and the E-Tech licensing agreements executed by Brownstein (from 2000 until 2005). We will rule out one of these sources and leave the others for the jury to decide on remand.

### i. Lindsay's Copyright Registrations

Lindsay's copyright registrations could not have expressly repudiated Brownstein's rights since, by their plain language, they only covered the EDS. As discussed above, the deposit copy did not expand the scope of her second registration by including Brownstein's ETHN programs. More importantly, as just established, a registration does not expressly repudiate authorship.

### ii. The 1996 Argument with Raskin

In the 1996 argument, which Brownstein recounted in his 1997 affidavit for the LSDI litigation, Lindsay told Raskin that "the copyright was in her name because she initiated it and did all the work and spent her own money and time to do it." (App. 2744-45 (Brownstein Aff. ¶ 31).) This argument declared very little expressly about Lindsay's copyrights: It did not identify the work to which she was claiming ownership and, at that time, Raskin and LSDI were not yet aware of the LCID (they were only aware of the EDS). As a result, this 1996 argument did not necessarily provide Brownstein a storm warning that Lindsay was repudiating his joint authorship of the LCID.

33

### iii. The 1997 Software License

The 1997 Software License is key because it is the first link in the chain of title that Lindsay supposedly conveyed through the trio of agreements — all of the subsequent license and settlement agreements turn on what was originally conveyed to TAP in this software license. The 1997 Software License purported to give TAP an exclusive license to the LCID, which included Lindsay's rules and Brownstein's computer programs. (*See* App. 668 (Software License Agreement, Schedule A).) In her testimony, Lindsay explained that this was her intention because the software license was supposed "to mak[e] sure that TAP owns both [the rules and the computer code]". (App. 1066 (Trial Tr. 272:15-20).) Lindsay was the only signatory to the license, both as the copyright holder and the representative of TAP. Brownstein was not a signatory to the agreement, which is the foible of Lindsay's plans.

Interestingly, her intention to grant an exclusive license to Brownstein's ETHN programs, as part of the LCID, did not actually interfere with Brownstein's ownership rights. As described previously, a co-author is allowed to grant a license to the joint work without the consent or involvement of her co-author — but such a license is treated like a non-exclusive license and does not negate the other co-author's ownership interest. 1 *Nimmer on Copyright* § 6.10; *see Davis*, 505 F.3d at 99-100. Viewing the evidence in the light most favorable to Brownstein, it is possible that he thought that the 1997 Software License merely conveyed a non-exclusive license for the LCID to TAP rather than declaring Lindsay the sole author of the LCID. Despite her subjective thoughts or evaluations, Brownstein's rights were not adversely affected by Lindsay's actions.

Further, a close look at the agreement shows that the language does not state that Lindsay was the exclusive author or owner of the entire LCID. It vaguely calls Lindsay the "Copyright Holder" without describing her specific copyright interests or referencing her actual copyright registrations. (App. 663 (Software License Agreement, June 1, 1997).) A reader might assume from this that she is the sole copyright holder of the LCID, but this would only be an assumption and not based on the strict language of the agreement.

### iv. The 1997 Agreement and the 2000 Agreement

The 1997 Agreement (which partnered TAP with CMR) fares no better in Lindsay's attempt to establish express repudiation since it was contingent on the rights held by TAP. The strongest language from this agreement only says that "TAP owns all rights, including copyrights" to the TAP system, which is the "exclusive property of TAP". (App. 631.) As discussed above, the 1997 Software License could not have conveyed Brownstein's ownership interest in the LCID to TAP without his consent in a signed writing. At most, TAP owned Lindsay's ownership interest in the LCID.

In fact, the 1997 Agreement states that the joint venture and the counterparty, CMR, "acknowledge at all times that the original TAP SYSTEM [the LCID] remains the property of TAP." (App. 633.) How could the property interest in the LCID be transferred to a new owner if it remained the property of the original owner? Thus, all the agreement actually did was give the joint venture, what would become E-Tech, a non-exclusive license to use the LCID and allowed E-Tech to combine the LCID with CMR's technology. It said nothing that was adverse to Brownstein's

35

ownership interest in the LCID — his rights could co-exist with the terms of the 1997 Agreement.

Although very similar to the 1997 Agreement, the 2000 Agreement did convey all of TAP's assets to the joint venture, but this also did not disturb Brownstein's ownership interest in the copyrights to the ETHN programs (and, by virtue thereof, the LCID). As mentioned, all TAP possessed was a non-exclusive license to the LCID from the 1997 Software License and possibly the assignment of Lindsay's ownership interest in the LCID. Thus, contrary to Lindsay's belief, the 2000 Agreement did not vest E-Tech with exclusive ownership over the LCID. As long as his ownership rights remained intact, Brownstein might not have seen any storm warnings requiring him to investigate the potential repudiation of his authorship.

**v. The 1998 Settlement Agreement**

The agreement which presents the most potential for Lindsay's argument is the 1998 LSDI Settlement Agreement, which Brownstein actually signed and which gave LSDI ownership over certain computer code referred to as the "LSDI Program". Lindsay claims that it decreed her exclusive ownership of the LCID by stating that her two copyrights cover the EDS "which may be called [the] LCID", but it is not for a settlement agreement to define the scope of her copyrights or her copyright registrations.[13] Such a

---

[13] A contract or agreement cannot alter copyrights or copyright registrations by simply renaming a work since nomenclature does not affect the substance or content of a work.

36

misnomer did not necessarily serve as a storm warning of repudiation of Brownstein's joint authorship of the LCID. Otherwise, it does not say much in her favor.

That language only renamed the EDS (which is all her exclusive copyrights and her copyright registrations likely covered) as the LCID, for the purposes of the agreement. Moreover, other language in the agreement controverts any exclusive ownership Lindsay would have been given over the LCID in the agreement by declaring that "Lindsay, Nelson, Brownstein, ET, TAP and CMR . . . are the sole owners of the copyrights". (App. 2772 (Settlement Agreement ¶ 18).) Thus, if the settlement language governed the boundaries of the copyrights, then Lindsay would actually have to share ownership in her copyrights with Brownstein and the other parties to the settlement agreement. It is surely difficult to characterize this as a storm warning — if anything, it might have confirmed for Brownstein that his rights to the LCID were preserved.

### vi. The 2010 Settlement Agreement

The 2010 Settlement Agreement is of little help to Lindsay. She argues that, by disowning any "right, title and interest" in E-Tech, Brownstein forfeited his ownership interests in his computer code. But what the agreement actually says is that Brownstein forfeited his rights and interest as a "shareholder, officer, employee or director in TAP or as manager, partner, member, officer, director or employee of E-Tech." (App. 520-21 (Settlement Agreement ¶ 2.6).) There is no basis to argue that Brownstein's independent ownership rights in his ETHN programs were subsumed in his positions in TAP or E-Tech. Further, as noted earlier, it is doubtful that TAP or E-Tech ever had

37

exclusive ownership of the LCID and Brownstein's ETHN programs.

### vii. Brownstein's E-Tech Licensing Agreements (2000-2005)

These standard consumer licensing agreements state that E-Tech owns the copyrights to the E-Tech system as its exclusive property, which is accurate and undisputed. Brownstein signed five of these agreements with E-Tech customers between 2000 and 2005, which satisfies the statute of frauds and imputes him with knowledge of their language. The distinguishing and critical fact is that the E-Tech system is a joint work formed from the combination of the LCID and CMR's own system. Therefore, by declaring that E-Tech owned the E-Tech system, the agreements were not asserting that E-Tech owned the copyrights to the LCID, which is a separately copyrightable component of the E-Tech system. It is plausible that Brownstein might have been put on inquiry notice by these agreements but, viewing the evidence in the light most favorable to Brownstein, it is also plausible that these agreements would not have provided storm warnings of repudiation — after all, Brownstein would not have been concerned with, and has never claimed authorship of, the E-Tech system.

### c. Questions Remaining for the Jury

Based on these potential sources of express repudiation, the District Court made its Rule 50(a) ruling when there were still genuinely disputed issues of material fact to be decided by the jury. As mentioned, Lindsay's registrations, standing alone, could not have repudiated Brownstein's authorship as a matter of law.

38

All the other potential sources of repudiation — the 1996 argument with Raskin, the 1997 Software License, the 1997 Agreement and 2000 Agreement, the 1998 Settlement Agreement, and the 2010 Settlement Agreement — involved factual determinations that should have been left for a jury. Accordingly, the issues of whether these six sources expressly repudiated Brownstein's authorship were inappropriately decided under Rule 50(a) and should have gone to the jury.

## C. CANCELLATION OF BROWNSTEIN'S COPYRIGHT REGISTRATIONS

In granting summary judgment to Appellees on their counterclaim, the District Court ordered the cancellation of Brownstein's 2009 copyright registrations. The District Court was in error ab initio. We hold that courts have no authority to cancel copyright registrations because there is no statutory indication whatsoever that courts have such authority. Also, there is substantial indication that courts do not have such authority.

Like most courts, our Circuit has never had the chance to ascertain the role of courts in the cancellation of copyright registrations. Of the few courts to do so, several have concluded that courts have no inherent or statutory authority to cancel copyright registrations. *See Xerox Corp. v. Apple Computer, Inc.*, 734 F. Supp. 1542, 1549 (N.D. Cal. 1990) (basing its decision on the Copyright Act, its legislative history, and Copyright Office regulations); *Leegin Creative Leather Prods., Inc. v. M.M. Rogers & Co.*, No. 94-4644, 1994 WL 761725, at *2 (C.D. Cal. Oct. 24, 1994) (observing that the Copyright Act and Copyright Office regulations do not call for judicial cancellation of registrations); *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775,

39

781-82 (9th Cir. 2002) (holding that cancellation of a copyright registration is an administrative remedy that must be sought from the Copyright Office). We agree.

Most decisively, there is no statutory authority in the Copyright Act that gives courts any general authority to cancel copyright registrations. 17 U.S.C. § 101 et seq.; *see* 5 William Patry, *Patry on Copyright* § 17:108. In fact, there is evidence that the statute does not give courts any such authority. Section 701, which describes the functions of the Copyright Office, explicitly states that "[a]ll administrative functions and duties under this title, *except as otherwise specified*, are the responsibility of the Register of Copyrights." 17 U.S.C. § 701(a) (emphasis added). Cancellation of a copyright registration is certainly an administrative function, at least as much as issuing a registration is an administrative function.[14] *See Syntek Semiconductor Co.*, 307 F.3d at 781-82.

---

[14] Quizzically, Brownstein argues that the District Court had authority to cancel his registrations, but we disagree. Brownstein suggests that the requisites of § 411(b), which establish the criteria for obtaining a copyright registration, also implicitly provide the criteria for courts to cancel a registration. 17 U.S.C. § 411(b). But a list of requirements is not a grant of authority. Section 411(b) states that "the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration," but it does not actually give courts authority to cancel a copyright registration. *Id.* If anything, this suggests that courts are not to adjudicate the grounds of cancellation because they are

40

It is also telling that the Lanham Act explicitly provides courts with the general authority to cancel trademarks. 15 U.S.C. § 1119 ("In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."). If Congress had intended to grant courts the same general authority with respect to copyright registrations, it could have done so in equally express statutory language.

It bears noting that there is a provision in the Copyright Act that grants courts cancellation authority with respect to "original designs".[15] 17 U.S.C. § 1324. In carving

---

limited to consulting the Register of Copyrights on such matters.

Brownstein also points to the cancellation regulation, 37 C.F.R. § 201.7, as evidence that Congress intended for courts to cancel copyright registrations. While § 201.7(b) clearly enumerates the requirements for cancellation of registration, § 201.7(a) also clearly delegates that authority to the Copyright Office. 37 C.F.R. § 201.7(a) ("Cancellation is an action taken by the Copyright Office . . . ."). This only reaffirms that the authority to cancel copyright registrations resides with the Copyright Office.

[15] Entitled "Power of court over registration", this provision recites that "[i]n any action involving the protection of a design under this chapter, the court, when appropriate, may order registration of a design under this chapter or the cancellation of such a registration" — thus, it only applies to

41

out a specific power of cancellation, this provision only further suggests that courts have no general authority to cancel copyright registrations. It is surely indicative that there is no such general cancellation provision in the Copyright Act. Where Congress has used language in one provision but excluded it from another, we must generally ascribe meaning to the exclusion. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-53 (2002); *Russello v. United States*, 464 U.S. 16, 23 (1983). Moreover, § 1324 would be superfluous if Congress intended for courts to already have the general authority to cancel copyright registrations.

This does not mean that courts have no place in the cancellation process and that aggrieved parties are without recourse to the courts when faced with faulty registrations. While courts may not directly cancel copyright registrations, courts have an oversight role in the administrative functions of the Copyright Office. All actions of the Copyright Office are subject to the Administrative Procedure Act ("APA") and the judicial review attendant to the APA. 17 U.S.C. § 701(e) ("Except as provided by section 706 (b) and the regulations issued thereunder, all actions taken by the Register of Copyrights under this title are subject to the provisions of the Administrative Procedure Act . . . ."). Thus, aggrieved parties may challenge an unfavorable decision by the Copyright Office in a cancellation matter by challenging its decision in court under the APA.

It also goes without saying that courts are authorized to police copyright registrations through authorship claims and

designs and only to that chapter of the Copyright Act. 17 U.S.C. § 1324.

infringement claims.  As emphasized earlier, a registration does not secure or create a copyright, as a right, or guarantee success on the merits of a claim — it entitles an author to bring an action under the Copyright Act and serves as proof of authorship of the copyrighted work.

Finally, we are in no way holding that courts are incapable of invalidating underlying copyrights.  While the two concepts are undoubtedly related,[16] the distinction matters.  Holding that federal courts have the authority to cancel registrations would essentially be declaring that the judicial branch has the authority to order a legislative branch agency that is not a party to the litigation to take an affirmative action.  A federal court's finding that a copyright is invalid, on the other hand, is a determination of *ownership* which does not disturb the registration of a copyright.  Courts have no authority to cancel copyright registrations because that authority resides exclusively with the Copyright Office.

## IV. CONCLUSION

For the foregoing reasons, we will reverse the District Court's Rule 50(a) grant of judgment as a matter of law on

---

[16] Validity of a copyright denotes ownership — a necessary element to bring a copyright infringement action.  *See Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 667 (3d Cir. 1990) ("'The elements of a copyright infringement action are (1) ownership of a valid copyright and (2) copying by the alleged infringer.'") (internal citations omitted).  Registration of a copyright, on the other hand, is merely "'prima facie evidence of the validity of the copyright . . . .'" *Id.* (quoting 17 U.S.C. § 410(c)).

Brownstein's joint authorship claim and remand for a new trial. We will also reverse the District Court's grant of summary judgment on Appellees' counterclaim to cancel Brownstein's copyright registrations.