RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ISAAC DONALD EVERLY,

　　　　　　　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

PATRICE Y. EVERLY; PHILLIP J. EVERLY; CHRISTOPHER
EVERLY; PHILLIP EVERLY FAMILY TRUST; EVERLY AND
SONS MUSIC, (BMI),

　　　　　　　　　　　　　　　　*Defendants-Appellants*.

No. 19-5150

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:17-cv-01440—Aleta Arthur Trauger, District Judge.

Argued:  October 23, 2019

Decided and Filed:  May 4, 2020

Before:  GUY, BUSH, and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:**  William Parsons, SHACKELFORD BOWEN MCKINLEY & NORTON LLP,
Nashville, Tennessee, for Appellants.  Joshua Counts Cumby, ADAMS & REESE LLP,
Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Jay S. Bowen, Lauren Spahn,
SHACKELFORD BOWEN MCKINLEY & NORTON LLP, Nashville, Tennessee, for
Appellants.  Joshua Counts Cumby, Philip M. Kirkpatrick, Linda Frances Howard, ADAMS
& REESE LLP, Nashville, Tennessee, for Appellee.  Andrew Grimm, DIGITAL JUSTICE
FOUNDATION, Omaha, Nebraska, for Amicus Curiae.

　　　　BUSH, J., delivered the opinion of the court in which MURPHY, J., joined.  MURPHY,
J. (pp. 23–34), delivered a separate concurring opinion.  GUY, J. (pp. 35–37), delivered a
separate dissenting opinion.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge.  The Everly Brothers are one of the most famous duos in popular American music history.  When Dick Clark introduced them to sing *Cathy's Clown* on his *American Bandstand* television show, he said the song "has a sound all its own"—one he called a "little unusual, [a] little strange, but very, very successful, and it's done in the inimitable style of the fellas who have done so many other hits."[1]  This dispute over the authorship of *Cathy's Clown* is likewise a little unusual and a little strange.  And, as we discuss, it is the jury's obligation to sort it all out.

Each side to this appeal—Don Everly, on the one hand, and the successors-in-interest of his brother, the late Phil Everly, on the other—claims to have a copyright interest in *Cathy's Clown*.  Don maintains he authored the song by himself, but Phil's successors contend the brothers wrote it together.  Don sued Phil's successors, seeking a declaration that Don was the sole author, while Phil's successors counterclaimed for declaratory relief that both brothers were authors.  The district court granted summary judgment to Don, finding that the claim of Phil's co-authorship was barred by the statute of limitations because Don expressly repudiated Phil's co-authorship, and thus triggered the statute of limitations, no later than 2011.  Because there is a genuine factual dispute as to whether Don made such an express repudiation, we **REVERSE**.

I.

We begin by going back sixty years, to 1960, when the Everly Brothers recorded, released, and copyrighted *Cathy's Clown*, which would be one of their most successful songs.  That same year they also recorded and released *Sigh, Cry, Almost Die* and *That's Just Too Much*.  (We refer to the three songs collectively as "the Compositions.").  Don and Phil granted 100% of the copyrights in the Compositions, including the rights to renew the copyrights, to Acuff-Rose Publications ("Acuff-Rose") in March and July 1960 ("1960 Grants").

---

[1]dailymotion, *Everly Brothers ~ *Dick Clark* announces *CATHY's CLOWN** (2014), https://www.dailymotion.com/video/x1oxa1j.

The original copyrights to the Compositions listed Phil and Don as authors, and the brothers were credited as co-authors, each receiving royalties, pursuant to their agreement with Acuff-Rose. They were both credited as authors of *Cathy's Clown* when Broadcast Music, Inc. ("BMI") presented them with an award for the hit in 1961, and again when BMI gave them a second award in 1975. The brothers also took joint credit for authoring the song in a television interview on *The David Frost Show* in 1972.

After sharing credit with his brother for many years, Don suddenly changed his tune. Sometime after the brothers stopped speaking in 1973, Don approached Phil about the rights to *Cathy's Clown*. There is evidence suggesting that this interaction occurred in 1980, either by letter or phone. Phil's wife, Patti Everly, testified that Phil had told her that Don had "demanded that [Phil] take his name off" the song, and that he "no longer had credit as a writer." R. 19-2, PageID 146. Joey Paige, Phil's friend and the band's bass player, testified that he personally overheard Phil's side of the phone call. He described the call as "verbally violent" and testified that the result of the call was that Phil would give *Cathy's Clown* back to Don. R. 19-4, PageID 179–80. According to Paige, he overheard Phil say "[y]ou know I wrote half that song." *Id.*, PageID 179. The record is unclear, however, because Don himself testified that he never made a phone call to Phil in 1980. Don claimed that the only communication between the two of them on the topic was a letter he sent to Phil sometime after 1975. R. 19-1, PageID 136; R. 22-1, PageID 430–31.[2] The letter, however, has not been produced in this litigation.

In June 1980, Don and Phil executed a document titled "Release and Assignment" (the "1980 Release"), in which Phil agreed to "release, and transfer, to the said Don Everly all of his rights, interests and claim in and to said compositions, including rights to royalties and his claim as co-composer, effective June 1, 1980." R. 1-3, PageID 21. Phil further agreed to "transfer, release, assign and set over unto Don Everly all of his rights, titles, interests and claim to the

---

[2]The clearest statement from Don that he never made the phone call, relied upon by defendants on appeal, is Don's March 2, 2018 deposition, but that deposition transcript was not before the trial court in the motion for summary judgment. Defendants also suggest that testimony regarding the letter is hearsay. However, this testimony appears not to be hearsay because it is not being offered to prove the truth of any statement in the letter, but instead for the fact that the letter was sent. *See, e.g.*, *Anderson v. United States*, 417 U.S. 211, 219 (1974) ("Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted."); *United States v. Boyd*, 640 F.3d 657, 663–64 (6th Cir. 2011) ("An out-of-court statement offered to prove something other than the truth of the matter asserted falls outside the definition of hearsay and is admissible.").

[Compositions]," which included "not only the said Phil Everly's right to royalties and other income arising out of the said compositions from and after the effective date, but also every claim of every nature by him as to the compositions of said songs." *Id.*

Following the 1980 Release, Don received all royalty payments and public credit as author of *Cathy's Clown*, and Acuff-Rose changed its business records to reflect Don as sole author. Similarly, the licenses and credits for *Cathy's Clown* issued by Acuff-Rose, and its successor-in-interest Sony/ATV Music Publishing, listed Don as the only author. When Acuff-Rose exercised its right to renew the copyright to *Cathy's Clown* in 1988, it listed Don as the only author. Despite these changes in royalties and public attribution, both brothers made public statements continuing to credit Phil as a co-author, in both a 1984 biography of the Everly Brothers and a television interview that same year on *Rock 'N' Roll Odyssey*.[3]

*Cathy's Clown* gained new life in 1990 when Reba McEntire released a cover version of the song, for which Don was credited as sole author in the album cover, sheet music, packaging, and press materials. Don was awarded the Robert J. Burton Award for BMI Country Music Singer of the Year for his contribution to the Reba McEntire cover, and he received the award as the sole author at the BMI ceremony.

---

[3]Don argues that we should not consider his statement from the *Rock 'N' Roll Odyssey* interview relating to joint authorship because, according to him, it was not in the court record at the time the district court granted summary judgment. He invokes the general rule that "an appellate court reviewing a grant of summary judgment cannot consider evidence that was not before the district court at the time of its ruling." *Good v. Ohio Edison Co.*, 149 F.3d 413, 421 n.16 (6th Cir. 1998); *see Neicko v. Emro Mktg. Co.*, 973 F.2d 1296, 1303 (6th Cir. 1992) ("When reviewing a summary judgment . . . an appellate court must not consider evidence that was not before the district court."); 16A Charles Alan Wright et al., *Federal Practice & Procedure* § 3956.1 (4th ed. 2008). However, Don's statement from the 1984 interview was, in fact, before the district court when it ruled on summary judgment. This interview was referenced in Don's deposition and attached as an exhibit thereto, and Don submitted an excerpt of this deposition in support of his motion for summary judgment. Although he did not include the interview as a separate exhibit in his briefing, the deposition excerpt he did submit to the district court includes the portion of the questioning in which a recording of the interview was played, and Don was specifically questioned as to his statement in the interview that Phil had co-authored the song: "[M]y question to you is why would you have said on those public appearances that he [Phil] co-wrote?" R. 19-5, at PageID 187. Furthermore, Don responded to the argument regarding the interview in his reply brief below, and the district court at least acknowledged that the statement in the interview had occurred. Given these references to the interview generally and to Don's statement in the interview regarding joint authorship in particular, it is appropriate to treat Don's statement as part of the summary-judgment record.

In 2011, Don sought to execute his right to termination under 17 U.S.C. § 304(c), which allows authors to terminate certain copyright grants and transfers and thus regain copyright ownership in their work. Specifically, Don sought to terminate the 1960 Grants to Acuff-Rose ("2011 Termination") in a notice of termination recorded with the Copyright Office on July 15, 2011, with an effective date of April 14, 2016. Pursuant to this termination, Don claims to have exclusive copyright ownership of the Compositions. Don also sought to remove Phil's name as author of the original copyrights at that time, but the Copyright Office rejected this effort as untimely.

Phil exercised termination rights of his own as to certain compositions, both in 2007 and again in 2012, but never attempted to terminate the 1960 Grants or any other grant related to *Cathy's Clown* or the other Compositions. After Phil's death in 2014, however, his children filed notices of termination as to the 1960 Grants seeking to regain Phil's rights to *Cathy's Clown*.[4] In 2016, they also served a notice of termination as to Phil's 1980 Assignment to Don.[5]

II.

On November 8, 2017, Don filed a complaint for declaratory relief against Patti Everly, Jason Everly, and Chris Everly as the statutory successors to Phil's termination rights under the copyright laws, and against the Phillip Everly Trust ("Trust") and Everly and Sons Music (BMI) as legal owner or successor to Phil Everly's rights or as legal owner of the statutory successors' rights. Don sought an order declaring that (1) Phil Everly is not an author of *Cathy's Clown*; (2) the 1980 Release is not a grant subject to termination under 17 U.S.C. §§ 304(c), 203(a); and (3) Don Everly owns 100% of the copyright termination rights in *Cathy's Clown*, and 100% of the songwriter royalties to the Compositions. R. 1, PageID 11–13.

---

[4]There is no evidence in the record that a similar notice of termination has been filed as to *Sigh, Cry, Almost Die* or *That's Just Too Much*, but Don contends that defendants filed such a notice after this lawsuit was initiated.

[5]Because the grant at issue occurred "on or after January 1, 1978," this termination was issued pursuant to 17 U.S.C. § 203(a) rather than § 304(c).

Defendants filed an answer, including various affirmative defenses, and counterclaims seeking declarations that (1) Phil Everly is an author of *Cathy's Clown*; (2) defendants' notice of termination of the 1980 Release was valid; and (3) defendants are entitled to one-half of the income earned from *Cathy's Clown*. R. 5, PageID 71. The answer and counterclaims do not address *Sigh, Cry, Almost Die* or *That's Just Too Much*.

Don moved for summary judgment. He argued that the counterclaims were barred by the statute of limitations, entitling him to summary judgment on counts I and III of the complaint.

The district court found that Phil's authorship had been expressly repudiated no later than 2011, when Don filed his notice of termination of the 1960 Grants, thus triggering the statute of limitations. Holding Phil's claim for authorship barred by the statute of limitations, the court granted summary judgment in favor of Don on counts I and III. It then dismissed count II, reasoning that the question of whether the 1980 Release could be subject to termination was mooted in light of its finding that defendants had no claim to authorship and, accordingly, no termination rights. R. 26, PageID 517–18. The court therefore entered an order declaring that (1) defendants are barred from asserting a claim based on Phil's co-authorship of the Compositions; (2) defendants are estopped from asserting any termination rights based on that purported authorship; (3) Don Everly owns 100% of the United States copyright in the Compositions and 100% of the songwriter royalties derived from the Compositions; and (4) any notices of termination filed by defendants pertaining to the Compositions are invalid. R. 27, PageID 520–21.

Defendants then moved for reconsideration, arguing for the first time that the district court improperly applied the statute of limitations to their factual defenses because the statute of limitations cannot be used as a "sword." R. 33, at PageID 603. They further contended, also for the first time, that Phil's termination claims cannot be time-barred because termination rights cannot accrue prior to their effective termination date.

The district court denied defendants' motion for reconsideration. Defendants timely appealed.

III.

We review a district court's grant of summary judgment de novo. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008)).

Appellants raise three issues on appeal. First, they contend that the district court erred by applying the statute of limitations to their factual defense. Second, they argue that the district court erroneously found that there was no genuine dispute of material fact as to whether Don expressly repudiated Phil's claim of authorship (and, accordingly, that the statute of limitations began to run). Third, they argue that the district court erroneously rejected their argument that the appropriate accrual date for a termination claim is the effective date of termination.[6]

Defendants failed to raise the first and third arguments before their Rule 59(e) motion to reconsider. Accordingly, we do not consider them here. *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *Am. Family Prepaid Legal Corp. v. Columbus Bar Ass'n*, 498 F.3d 328, 335 (6th Cir. 2007); *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835

---

[6]There is some ambiguity about whether this lawsuit involves all three Compositions or merely *Cathy's Clown*. Defendants argue that the original complaint sought a declaration regarding ownership of only *Cathy's Clown*, but this is incorrect because the complaint requests at least some relief as to *Sigh, Cry, Almost Die* and *That's Just Too Much* as well. *See* R. 1 at PageID 2 ¶ 2 n.1; ¶ 47. Moreover, both sides litigated at summary judgment under the assumption that all the Compositions were at issue, and the district court granted declaratory relief as to all three songs. On appeal, defendants' arguments pertain only to *Cathy's Clown*. In a footnote, they request that the district court be reversed to the extent it granted relief for claims that Don never pled. The parties acknowledged at oral argument that *Cathy's Clown* is the only work with significant monetary value. Because defendants have forfeited any argument as to the other two Compositions, we affirm the district court as to *Sigh, Cry, Almost Die* and *That's Just Too Much*. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited].").

(6th Cir. 1996) (declining to address argument raised for the first time on motion to alter or amend judgment).

We consider only whether Don expressly repudiated Phil's claim and therefore triggered the statute of limitations.

A.    Authorship, Ownership, and Termination Rights

Under the copyright laws, ownership in a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Copyright ownership, in turn, entitles one to the "exclusive right to do and authorize" uses of the work, including "reproduc[ing] the copyrighted work," "prepar[ing] derivative works," "distribut[ing] copies . . . of the copyrighted work to the public by sale or other transfer," and, depending on the type of medium, "perform[ing]" or "display[ing] the copyrighted work publicly." *Id.* § 106. Copyright owners also can sue to recover damages for infringement. *Id.* §§ 501(b), 504(b)–(c).[7] These ownership rights "may be transferred in whole or in part," *id.* § 201(d), and offer the opportunity to monetize the copyrighted work. Accordingly, "the author commonly sells his rights to publishers who offer royalties in exchange for their services in producing and marketing the author's work." *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 547 (1985).

In addition to the initial vesting of ownership rights, authorship status has other implications in copyright law unaffected by the transfer of ownership. For example, the duration of a copyright in a work created on or after January 1, 1978 is measured against the life of the author. *See* 17 U.S.C. §§ 302(a), (c). Additionally, for older copyrights, a copyright's renewal term will automatically vest in the author after expiration of the original term, s*ee* 17 U.S.C. § 304(a), although in practice the right to renewal is often transferred along with ownership in the initial term. *See Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 659 (1943). Further, and most relevant here, authors possess a "termination right," which allows them to terminate, after a period of time, "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright." 17 U.S.C. § 203(a) (providing right to terminate

_____

[7]The statute provides that, "with respect to any one of the exclusive rights comprised in a copyright," the term "copyright owner" "refers to the owner of that particular right." 17 U.S.C. § 101.

post-1978 grants between thirty-five and forty years after the grant); *see id.* § 304(c) (providing right to terminate grants "executed before January 1, 1978" any time between fifty-six and sixty-one years after copyright, or period of five years after January 1, 1978). Authors are thus entitled to terminate certain grants and regain copyright ownership in their works after a period of time. Unlike the author's right to renewal, termination rights cannot be transferred. *See* 17 U.S.C. § 203(a)(5) (termination "may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or make any future grant"); *id.* § 304(c)(5) (same).

There are three terminations at issue in this case: (1) Don's 2011 termination of the 1960 Grants, (2) Phil's 2014 termination of the 1960 Grants, and (3) Phil's 2016 termination of the 1980 Release. But, for Phil to have any right to termination, he must be an "author" of *Cathy's Clown*. *See* 17 U.S.C. §§ 203(a), 304(c).

B.      The Statute of Limitations

Copyright claims are subject to a three-year statute of limitations. 17 U.S.C. § 507(b) provides that "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim accrued." For ordinary infringement claims, it is simple to calculate the statute of limitations: "each new infringing act causes a new three year statutory period to begin." *Roger Miller Music v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007) (quoting *Ritchie v. Williams*, 395 F.3d 283, 288 n.5 (6th Cir. 2005)). A claim for ownership, however, "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Id.* (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996)). To determine the accrual date of a claim for copyright ownership between co-authors, we have explained that "the statutory period for any action to establish ownership begins to run whenever there is a 'plain and express repudiation' of ownership by one party as against the other." *Ritchie*, 395 F.3d at 288 n.5 (quoting *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230–31 (9th Cir. 2000)); *see Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 118 (2d Cir. 2018); *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004) ("[T]he copyright statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights, in this case by repudiating [the plaintiff's] ownership of copyright." (internal citations omitted)); *Zuill*, 80 F.3d at 1369 ("[C]laims of co-ownership, as distinct from claims of infringement, accrue

when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of the repudiation.").[8]

"Repudiation in this copyright context resembles the doctrine of adverse possession in real property." 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 12.05[C][1], LEXIS (database updated 2020); *see Zuill*, 80 F.3d at 1370 (recognizing similarity between express repudiation and adverse possession). The Ninth Circuit explained that analogizing copyright repudiation to adverse possession is appropriate because "[c]opyright, like real estate, lasts a long time, so stability of title has great economic importance." *Zuill*, 80 F.3d at 1370. An ownership claim therefore must be brought within three years after the purported owner's status as such is challenged by a party with a competing claim of ownership.

The most straightforward means of repudiating a claim is a direct statement from one party to another claiming exclusive rights to the work. This principle was applied in *Ritchie*, which involved a dispute between the artist Kid Rock and his former promoter Alvin Williams.

---

[8]Some circuits apply the "express repudiation" test as a component of the ordinary notice rules governing copyright claims. For instance, the Second, Seventh, and Tenth Circuits have held that a claim for co-ownership accrues when a putative plaintiff is on inquiry notice of her claim, and express repudiation is sufficient to put the plaintiff on such notice. *See Wilson*, 892 F.3d at 118; *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1016 (10th Cir. 2013); *Gaiman*, 360 F.3d at 653. The Third Circuit has similarly applied the express repudiation test to that circuit's normal notice rule governing copyright claims—the "discovery rule." *See Brownstein v. Lindsay*, 742 F.3d 55, 70 (3d Cir. 2014) ("[I]n assessing the accrual of a joint authorship claim, we will apply the discovery rule to the express repudiation rule. Fusing these two concepts, the discovery rule will only apply once a plaintiff's authorship has been expressly repudiated since he can only be on inquiry notice once his rights have been violated."). The Fourth Circuit has applied the express repudiation test without deciding whether it is a different standard than the ordinary notice rules governing copyright accrual. *See Davis v. Meridian Films, Inc.*, 14 F. App'x 178, 182 (4th Cir. 2001) ("Even assuming that [Plaintiff] is correct in his assertion that the 'express repudiation' standard is somehow higher than the ordinary standard for the accrual of a civil copyright claim, [Defendant's] placement of a copyright notice on the videos constituted an express rejection of competing claims of authorship."). The First Circuit has applied the express repudiation test and stated that it is a higher standard than the inquiry notice standard from the Second Circuit, *see Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006), but seemingly did so based on an understanding that the Second Circuit treats the accrual date as the time of creation, *id.* We do not read the Second Circuit's cases this way and have not located a case treating an authorship claim as time-barred because it was not brought within three years of creation. *Cf., e.g.*, *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011). This circuit, like the Ninth Circuit, has simply held that the claim is triggered at the time of express repudiation, rather than treating such repudiation as a component of inquiry notice or "discovery-rule" notice. *See Roger Miller Music*, 477 F.3d at 390 ("A claim for copyright ownership 'is barred three years from "plain and express repudiation" of authorship.'" (quoting *Ritchie*, 395 F.3d at 288 n.5)); *see also Aalmuhammed*, 202 F.3d at 1231 (holding that co-authorship claim is "barred three years from 'plain and express repudiation' of authorship"). Despite any semantic differences between these approaches, the cases from our sister circuits are instructive because they all turned on whether the plaintiffs' claims had been "expressly repudiated," rather than any other nuance of notice rules. We need not consider whether some conduct *other* than express repudiation is sufficient to trigger the statute of limitations in those circuits or this one.

395 F.3d at 287.  Williams claimed that before his rise to stardom, Kid Rock had entered a partnership agreement in which they agreed that they would co-own the copyright to all Kid Rock songs.  *Id.* at 285, 287.  Shortly after they entered into the agreement, however, Kid Rock wrote a letter to Williams "flatly stating that he did not intend to work with [Williams] with respect to the publishing, production or performance of his songs," and "made it clear that he regarded the songs he had written as his songs."  *Id.* at 288.  He also "claimed exclusive ownership" of the songs.  *Id.*  We held that Kid Rock plainly and expressly repudiated Williams' ownership in the songs, and found Williams' claims untimely because he failed to bring them within the three-year limitations period.  *Id.*  Similarly, in *Zuill*, the Ninth Circuit held that the creator of the "Hooked on Phonics" program (Shanahan) expressly repudiated the ownership of a musical arranger (Zuill).  80 F.3d at 1368, 1371.  Shanahan claimed sole ownership of the copyright by, among other things, claiming sole ownership in the compensation agreement between himself and Zuill and providing Zuill with a copy of the product which stated in writing that Shanahan's company owned the copyright.  *Id.*; *see also Gaiman*, 360 F.3d at 656 (repudiation by letter sent directly to author).

Even absent such a direct communication as in *Ritchie*, a plaintiff's claim may be repudiated if the work is published but the plaintiff is not appropriately credited.  For example, in *Aalmuhammed*, the plaintiff sought a declaratory judgment that he was a co-author of a major motion picture.  *See* 202 F.3d at 1230.  Although the plaintiff sought a declaration as to an ownership right, the dispute turned on whether his involvement was sufficient to make him an "author."  *Id.*  The Ninth Circuit held that his authorship was repudiated when the movie credits "list[ed] [him] far below the more prominent names, as an 'Islamic technical consultant.'"  *Id.* at 1231.  This designation in the movie credits was an open challenge to his claimed status as co-author and therefore triggered the statute of limitations.  *Id.*; *see also Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (putative author's claim repudiated by publication of book without listing her as author).  Of course, publication of the work without credit on its own would not trigger the statute of limitations if the plaintiff was unaware of the publication or her absence from the credits.  *See Gaiman*, 360 F.3d at 654 (finding ownership claim not time-barred notwithstanding adverse copyright notice appearing in published works because jury was entitled to believe his testimony that he had not seen those copies of the works).

Finally, courts have found that a co-owner's claim may be repudiated when she learns she is entitled to royalties she is not receiving. *See Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016); *Merchant v. Levy*, 92 F.3d 51, 56–57 (2d Cir. 1996); *see also Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006).

The Second Circuit has recognized these situations—direct repudiation, publication of the work without credit, and non-receipt of royalties—as three types of repudiation and refers to them as private repudiation, public repudiation, and implicit repudiation.[9] *See Wilson*, 892 F.3d at 118 (quoting *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2011)). Although we have not before had occasion to consider this approach, for our purposes we find it consistent with our caselaw and that of the Ninth Circuit which we have adopted.

All of these examples, however, concern claims for copyright ownership, which is not at issue in this case, which involves copyright authorship. As explained, ownership rights are transferrable, and defendants acknowledge that Phil transferred his ownership rights to Don in the 1980 Release. Defendants' claim is instead for authorship *qua* authorship, relevant only for the termination rights available under 17 U.S.C. §§ 203(a), 304(c). Nevertheless, as the parties agree, we find that the express repudiation test should apply to such a claim for a declaration of authorship rights as it does in the ownership context. Settling property rights is equally important, if not more important, in the context of authorship than ownership. Authorship status has important implications, such as determining the copyright's duration as well as the accrual of the renewal term. *See* 17 U.S.C. §§ 302(a), (c), 304(a). Allowing authors to sleep on their rights even after they have been repudiated would inject instability into an area of copyright law that calls out for certainty. Moreover, this approach is consistent with cases considering repudiation

---

[9]We acknowledge that there may be some linguistic tension in suggesting that a claimant can "expressly repudiate" another's claim by "implicit repudiation." We assume without deciding that the semantic distinction does not make a difference. The Second Circuit was applying the "express repudiation" test when it articulated the potential to trigger the statute of limitations by "implicit repudiation." *See Gary Friedrich Ent., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2011). But even if there is doctrinal tension between implicit and express repudiation, we need not decide here. In this case, Don could not have implicitly repudiated Phil's rights because under any interpretation of the 1980 Release, Don had the right to receive royalties for *Cathy's Clown*. The receipt of royalties would therefore not be adverse to Phil's claims.

of authorship when ownership turns on a plaintiff's claimed status as an author. *See, e.g.*, *Aalmuhammed*, 202 F.3d at 1230.

Although we have not identified any cases discussing express repudiation of an authorship claim without a corresponding ownership claim, we are not without guidance in answering this narrower question. First, we can look to ownership cases in which a defendant has raised a statute of limitations defense based on the defendant's repudiation of the plaintiff's authorship. *See Aalmuhammed*, 202 F.3d at 1230–31 ("Because creation rather than infringement is the gravamen of an authorship claim, the claim accrues on account of creation, . . . and is barred three years from 'plain and express repudiation' of authorship." (quoting *Zuill*, 80 F.3d at 1371)); *see also Kwan*, 634 F.3d at 229. Second, we look to cases applying the "express repudiation" test to determine the accrual date of claims for ownership of a copyright's renewal term as opposed to ownership of the initial term. In that context, the claim accrues only when the right to the renewal term is itself repudiated; any actions repudiating ownership of the initial copyright are irrelevant. *See Wilson*, 892 F.3d at 118 ("If Plaintiffs were the authors of the [disputed] composition and sound recording, as alleged, they were entitled under § 304 to the renewal terms regardless of whether they abandoned their rights to the initial terms . . . ."); *Friedrich*, 716 F.3d at 318 ("But . . . the notice would have only indicated that [defendant] Marvel held the rights to the initial term copyright. It would not have conclusively demonstrated that Marvel was the author or otherwise had the right to register the renewal term.").

Applying these principles, an authorship claim will not accrue until the putative author's status *as an author* is expressly repudiated; actions repudiating ownership are irrelevant to begin the statute of limitations for an authorship claim because repudiation of ownership is not adverse to the author's claim as such. *See Wilson*, 892 F.3d at 117; *Friedrich*, 716 F.3d at 317–18. The party claiming sole authorship can repudiate the plaintiff's authorship (1) privately in direct communication with the plaintiff, *see Ritchie*, 395 F.3d at 287; *Zuill*, 80 F.3d at 1368, 1371; (2) publicly by asserting sole authorship to the world and the plaintiff, including the listed credit on the published work, *see Kwan*, 634 F.3d at 229; *Aalmuhammed*, 202 F.3d at 1230; or (3) implicitly by receiving remuneration for the work to which the plaintiff is entitled, *see Mahan*, 634 F. App'x at 331; *Merchant*, 92 F.3d at 56–57. Of course, to repudiate the plaintiff's

claims under the latter two theories, the receipt of money and credit must actually be adverse to the plaintiff's authorship status. *See Brownstein v. Lindsay*, 742 F.3d 55, 72 (3d Cir. 2014) ("It follows that, if an action is not hostile to an author's rights, it may not be plain that his authorship rights have been repudiated.").

Regardless of whether repudiation of authorship is made privately, publicly or implicitly, it must come from someone asserting authorship of the work, not from a third party. *See Brownstein*, 742 F.3d at 70 ("[A] joint authorship claim arises and an author is alerted to the potential violation of his rights when his authorship has been expressly repudiated *by his co-author*." (emphasis added)); *Kwan*, 634 F.3d at 228 (noting that statute of limitations begins to run upon "[a]n express assertion *of sole authorship or ownership*" (emphasis added) (alteration in original)); *Aalmuhammed*, 202 F.3d at 1229 (Spike Lee, who "co-wrote the screenplay," also "directed, and co-produced the movie" in which the credits repudiated the plaintiff's authorship claim to the film). A person's authorship of a work can be legally called into question only if it is challenged by another person who herself claims authorship of the work in question, or that person's heir(s) if she is deceased, just as an ownership claim accrues only when "there is a 'plain and express repudiation' of ownership by one party" who claims ownership "as against the other." *Ritchie*, 395 F.3d at 288 n.5 (quoting *Aalmuhammed*, 202 F.3d at 1230). Although we have acknowledged that in the context of ownership, express repudiation can be effectuated by a non-author who has been assigned ownership rights by an author, in the context of authorship disputes, express repudiation must be made by an author herself because, unlike ownership, authorship is not transferrable by contract. Thus, the person repudiating another's authorship must herself have a claim of authorship in the work in question and also some significant involvement in the statement or act of repudiation, of which the other person is aware.[10]

---

[10]We acknowledge that some cases have discussed repudiation by a third party (such as the publisher), *see Aalmuhammed*, 202 F.3d at 1230 (discussing repudiation by "movie credits"), or by the plaintiff herself, *see Roger Miller Music*, 477 F.3d at 390. We understand this language as shorthand for the proposition that the actions of third parties and the plaintiff may serve as circumstantial evidence of repudiation by a putative co-author or co-owner. For example, the movie credits in *Aalmuhammed* could be ascribed to the putative co-author, Spike Lee, because he was a producer and director of the film. And we read *Roger Miller Music* to hold simply that the plaintiff did not repudiate his own ownership by sending the defendant an audit letter and the defendant did not repudiate the plaintiff's ownership by paying royalties. *See* 477 F.3d at 390.

To illustrate this latter point, consider a recent article from *The New Yorker* reporting on a letter from the late Justice John Paul Stevens, in which he expressed the view that Edward de Vere, the Earl of Oxford, wrote all of William Shakespeare's plays. *See* James Shapiro, *An Unexpected Letter From John Paul Stevens, Shakespeare Skeptic*, The New Yorker (Aug. 6, 2019), https://www.newyorker.com/culture/culture-desk/an-unexpected-letter-from-john-paul-stevens-shakespeare-skeptic. If Shakespeare and de Vere were still alive today, Shakespeare's authorship claim for *Hamlet* would not accrue upon the reporting by *The New Yorker* of Justice Stevens's belief, and Shakespeare would have no freestanding obligation to seek a declaration of his rights. Instead, accrual would turn on what, if anything, de Vere did to acknowledge the truth of the report and Shakespeare's awareness of de Vere's response. The statute of limitations for Shakespeare's authorship claim to *Hamlet* would not commence until de Vere wrote, said or did something himself, and of which Shakespeare was aware, to expressly repudiate Shakespeare's penning of that work.

To be sure, the statements and conduct of third parties can serve as circumstantial evidence that another putative author has expressly repudiated the plaintiff's rights. For example, even though the payment of royalties is carried out by a third party (the publisher), it is circumstantial evidence that another individual is making a claim to authorship (for why else would the publisher agree to pay?). But for Shakespeare's claim against de Vere to accrue, there would need to be some basis from which a factfinder could conclude that the article demonstrated that de Vere was "violating [Shakespeare's] rights," *Gaiman*, 360 F.3d at 653, rather than simply demonstrating one commentator's view on the issue not shared by the other putative claimant.

Returning from Shakespeare to the Everly Brothers, the foregoing legal principles play out in arguments made by the respective sides to this case. Don claims that his evidence conclusively meets all of the requirements for express repudiation. Relying on all three types of repudiation evidence, Don argues that he (1) privately and directly communicated to Phil a repudiation of Phil's co-authorship, (2) publicly repudiated Phil's co-authorship through certain statements and acts, such as Don's acceptance of sole-authorship recognition and credit from BMI, Acuff-Rose and Reba McEntire; and (3) implicitly repudiated Phil as a co-author through

receipt of all royalties from the Compositions to the exclusion of Phil. In response, Phil's successors in interest (defendants below) contend that none of Don's evidence is dispositive as to whether Don expressly repudiated Phil's co-authorship status. Defendants rely on the distinction between copyright ownership and authorship, noted above, and argue that while Phil gave up certain ownership rights, Don never expressly repudiated Phil's status as an author. In this regard, defendants interpret the 1980 Release as only a transfer by Phil to Don of the rights to profits and public recognition for the Compositions, without any repudiation by Don of Phil's co-authorship rights or acquiescence by Phil to any such repudiation. Defendants also point to post-1980 evidence, such as a television interview in 1984, in which Don continued to represent that he and his brother were co-authors of *Cathy's Clown*.

The central question in this case, then, is straightforward: did Don expressly repudiate Phil's status as a co-author, or did he simply exercise the rights to royalties and public credit that Phil voluntarily granted him in the 1980 Release without changing Phil's status as a co-author of the Compositions? We discuss the evidence pertinent to resolution of this question in more detail below.

C.      Don and Phil's Dispute

The parties agree that the 1980 Release cannot itself transfer authorship status or termination rights. *See* 17 U.S.C. §§ 203(a), 304(c). Don argues instead that regardless of this assignment's legal effect, it is strong evidence that Phil was on notice that Don disputed his authorship of the song. Don asserts that Phil's authorship was repudiated when (1) Don demanded that Phil "take his name off of the songs," which precipitated the 1980 Release; (2) BMI and Acuff-Rose subsequently corrected their records to list Don as the only author, paid royalties to Don only, and licensed the song listing Don as the author; (3) Don received credit as sole author for a BMI Country Music award for the Reba McEntire cover of *Cathy's Clown*; (4) Acuff-Rose renewed the copyright in Don's name only in 1988; and (5) Don terminated the initial copyright in 2011.

Defendants posit that the transfer was a rough-justice agreement to settle intra-family copyright disputes and that Don's subsequent claim of sole credit was consistent with that agreement.

We agree with defendants that there is a genuine factual dispute as to whether the 1980 Release reflected a repudiation of Phil's authorship or rather a voluntary transfer of certain ownership rights, possibly including the right to receive public credit, for *Cathy's Clown*.

As explained below, none of the evidence relied upon by Don establishes as a matter of law that he plainly and expressly repudiated Phil's authorship. Rather, the proof presents a genuine issue of material fact as to whether such repudiation occurred.

1.       1980 Release

Don argues first that he privately repudiated Phil's ownership before and during execution of the 1980 Release. Specifically, Don has introduced evidence that he demanded that Phil: "take his name off" of *Cathy's Clown*; acknowledge that he was not the owner; "set the record straight" about who is the author of the song; and disclaim his "claim as co-composer." R. 1-3, PageID 21; R. 19-2, PageID 146; R. 19-3, PageID 155, 164; R. 19-5, PageID 187–88; R. 19-14, PageID 368. If a jury were to find that the phone call occurred in this manner, that would support a finding that Don challenged Phil's status as co-author. *See Ritchie v. Williams*, 395 F.3d 283, 288 (6th Cir. 2005) (finding express repudiation of ownership when author sent letter "openly claim[ing] exclusive ownership"); *Gaiman v. McFarlane*, 360 F.3d 644, 656 (7th Cir. 2004) (similar).

However, defendants dispute this version of the facts and argue that Phil transferred certain ownership rights voluntarily for reasons unrelated to authorship. First, they point out that Don's evidence is internally inconsistent; Joey Paige testified that the dispute transpired when Don called Phil to demand that he remove his name from the songs, while Don testified that he does not recall calling Phil with such a demand, and that the only communication precipitating the 1980 Release was a letter sent sometime after 1975, a document notably missing from the record. A reasonable factfinder could therefore determine that the call never occurred. It could also find that the letter as described by Don was never sent.

The brothers' conduct before and after the 1980 Release could also color a factfinder's understanding of what happened in 1980. In the initial publication agreement, the brothers represented to Acuff-Rose that they had co-authored the song. They were both identified as co-authors on the initial copyright registration with the Copyright Office. They received two BMI awards as co-authors, one in 1961 and another in 1975. Moreover, Don himself stated on *The David Frost Show* in 1972 that they had written the song together and provided details about the writing process.

The brothers continued to tell a similar story after the 1980 Release was executed. Don recounted the story of *Cathy's Clown* in a second television interview on *Rock 'N' Roll Odyssey* in 1984, stating "I started a song, called Phil over, he came over and we worked – we hashed it out and went in the studio." R. 37. Similarly, a 1984 Everly Brothers biography noted that Phil had co-written the song with Don. Specifically, Phil is quoted as saying: "He'd written the chorus of *Cathy's Clown* and had the melody for the verses. I just put together the verses and it was finished." R. 19-5, PageID 193–94. A reasonable juror could consider Don and Phil's continued acknowledgment of Phil's co-authorship before and after 1980 as evidence that, at the time of the assignment in 1980, Don had not actually disputed Phil's status as an author.[11]

The language of this assignment also does not unambiguously demonstrate that Don challenged Phil's status as co-author. Phil purported to "transfer, release, assign and set over unto Don Everly all of his rights, titles, interests and claim to the musical composition[] 'CATHY'S CLOWN,'" and to "transfer and release" to Don "every claim of every nature by him as to the composition[] of [*Cathy's Clown*]." R. 1-3, PageID 21. While this release could refer to Phil's contractual rights to receive royalties, it could also suggest that Phil was transferring an ownership interest derivative of his authorship status. That interpretation would support the view

---

[11]By describing the 1984 evidence as the "only countervailing evidence," Dissent, Slip Op. at 37, the dissent wholly ignores the ambiguous language of the 1980 Release, the sparse and inconsistent nature of Don's evidence, and twenty years of acknowledgment by Acuff-Rose, BMI, and Don himself that Phil had co-authored the song. Moreover, the evidence from 1984 is itself significant because neither Don nor the dissent has located a single case in which a co-author has expressly repudiated another's status yet continued to publicly credit him *after* the purportedly repudiating act. And the dissent seems to agree that the 1984 interview and book preclude an affirmance of summary judgment solely on the basis of the 1980 conduct, if we assume that "muddy the waters," *id.* at 37, really means "creates a genuine dispute of material fact."

that Don continued to acknowledge Phil's co-authorship status and that Don's request for the transfer was based on his continued belief that Phil had authored the song.

To be sure, some language supports Don's version of events. For example, Phil disclaimed "all of his rights, interests and claim in and to said compositions, including rights to royalties and *his claim as co-composer*," and "every claim of every nature by him *as to the compositions of said songs.*" *Id.* (emphases added). But because the assignment itself cannot transfer authorship status, this language is simply additional evidence a jury could consider in resolving a factual dispute about the interaction between Don and Phil.**[12]**

Specifically, a reasonable juror could find, as Don argues, that the 1980 Release is evidence that Don challenged Phil's status as author. But, a reasonable juror could also find that this document was simply the transfer of the right to receive the benefits of authorship, such as royalties and license payments. And, finally, a reasonable juror could find that the release was also a transfer of the right to publicly receive credit for the song.

Accordingly, defendants have identified a triable factual dispute about the events precipitating the 1980 Release. If Don challenged Phil as to his actual contribution to the work, then the statute of limitations would have been triggered. But if the writing in 1980 was a voluntary transfer in which Phil "sold" the right to receive compensation or public credit for *Cathy's Clown*, Don's conduct would not be a repudiation of his authorship, and his claim would be timely. *See Gary Friedrich Ent., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 318 (2d Cir. 2013) ("But . . . the notice would have only indicated that [defendant] Marvel held the rights to the initial term of copyright. It would not have conclusively demonstrated that Marvel was the author or otherwise had the right to register the renewal term."); *see also Gaiman*, 360 F.3d at 654 (comparing express repudiation to adverse possession and holding that statute of limitations does not begin to run for conduct that is not adverse to one's copyright).

---

**[12]**The dissent ignores that the language in the 1980 Release cuts both ways. It could be interpreted, as Don argues, to mean that Phil was conceding he had not authored the song. But it could also be interpreted, as Phil argues, to mean that Don could receive the rights *arising out of* Phil's undisputed authorship status. The question is not whether the language of the Release "is evidence that Don had made a demand that challenged Phil's co-authorship," Dissent, Slip Op. at 37; it is whether the evidence conclusively establishes as a matter of law that he did.

Having found that a jury could conclude that the 1980 Release reflected a voluntary grant of the right to receive credit for *Cathy's Clown*, with no effect on Phil's co-authorship, Don's additional arguments are unconvincing. Any conduct could be interpreted either as adverse to Phil's authorship claim, or consistent with the voluntary grant in the release. We discuss Don's other arguments in turn.

2. Reba McEntire Cover

The Reba McEntire cover, and the credit Don publicly received, arguably support Don's claim that any potential ambiguity about his repudiation of Phil's authorship status was put to rest no later than 1990. There is no dispute that when Reba McEntire covered *Cathy's Clown*, Don was listed as the sole author in the record sleeve, liner notes, press materials, and sheet music. When he received the Robert J. Burton Award, he did so as sole songwriter. There is also no dispute that Phil was aware that Don received and accepted this public recognition, and the evidence in the record suggests that Phil found it troubling.

This public recognition omitting any credit to Phil may ordinarily have constituted a public repudiation of his authorship and triggered the statute of limitations. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (acknowledging that the "movie credits plainly and expressly repudiated authorship, by listing Aalmuhammed far below the more prominent names, as an 'Islamic technical consultant'"); *see also Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (finding "no question" that putative author was aware of dispute regarding her rights when book was published without listing her as an author). There is no dispute that Don was openly claiming sole public credit for the song and that Phil was aware he was doing so. *Cf. Gaiman*, 360 F.3d at 654 (no express repudiation as a matter of law when plaintiff testified he was not aware of published works displaying contrary copyright notice).

However, accepting Phil's version of the facts about the nature of the 1980 Release, it is possible that the right to receive public credit (in addition to simply financial compensation) was included in the bundle of rights that he voluntarily transferred to Don to settle other copyright disputes. In this unusual situation in which Phil has introduced a plausible alternative explanation for Don's actions, Don's receiving sole credit would not be adverse to Phil's claim

of authorship. Just as a tenant cannot adversely possess an owner's property, Don could not have repudiated Phil's authorship if he took credit for the work pursuant to Phil's voluntary grant of the right to do so. *See Gaiman*, 360 F.3d at 655 (comparing co-ownership in copyright to co-tenancy in real property). If Don never challenged Phil's status as an author, there would be nothing adverse about his receipt of the award.

Don's argument about the BMI award is further complicated because Don and Phil jointly received two BMI awards for the original version of the song in 1961 and 1975.[13] Accordingly, it could therefore be argued that Don's claim of sole authorship—the declaratory relief sought here—is inconsistent with many years of conduct by the brothers. This history presents a genuine factual dispute as to authorship that must be resolved by a factfinder.

Finally, Don's argument that his receipt of songwriter royalties repudiated Phil's authorship as a matter of law is unconvincing because the receipt of royalties undoubtedly falls within the scope of the 1980 Release and, under defendants' interpretation of that assignment, does not show that Don repudiated Phil's authorship.[14]

### 3.     Licenses, Royalties, and the 2011 Termination

Because there is no evidence that Phil was aware that Don was listed as sole author of *Cathy's Clown* in the copyright renewal, licenses, or 2011 Termination, they are not evidence of

---

[13]The same point could be made for Don's argument regarding the copyright termination and renewal registration; Don and Phil were listed as co-authors in the original copyright registration.

[14]Although the dissent states that Don expressly repudiated Phil's authorship "well before" 2011, Dissent, Slip Op. at 36, the dissent never actually identifies the conduct it believes to constitute repudiation. Assuming that the 1980 Release and the precipitating conduct is not enough, *see supra* n.11, and that it also cannot be the 2011 Termination, *see* Dissent, Slip Op. at 35–36, the dissent must be relying on the Reba McEntire cover in 1990. But of course, this action would not repudiate Phil's ownership if it was not actually adverse to Phil's status or adverse to his interest. *See Brownstein v. Lindsay*, 742 F.3d 55, 72 (3d Cir. 2014) ("It follows that, if an action is not hostile to an author's rights, it may not be plain that his authorship rights have been repudiated."). So this brings us back to the initial question of what transpired between the brothers precipitating the 1980 Release and whether Don actually challenged Phil's status rather than simply demanding credit and royalties. As discussed, we could agree with Don on this point only by accepting his version of events wholesale based only on a letter that has never been discovered and a phone call that he himself claims never occurred. The dissent attempts to avoid this conclusion by simply stating that "it cannot be the case that one can avoid the accrual of a claim based on a dispute over co-authorship by agreeing to give up the right to claim to be a co-author." Dissent, Slip Op. at 37. Respectfully, that misses the point. It is not that Phil has "avoid[ed] the accrual" of his claim; it is that a reasonable juror could find that Don never contested that Phil actually co-authored the song.

express repudiation.  *See Wilson v. Dynatone Pub. Co.*, 892 F.3d 112, 119–20 (2d Cir. 2018) (copyright registration did not repudiate authorship claim because nominal authors did not have reasonable notice of the nature of the registration); *Gaiman*, 360 F.3d at 654–55 (copyright registration does not constitute constructive notice of copyright ownership).  Don argues that the registration and licenses may be taken into consideration in the totality of the circumstances, but seemingly concedes that, at least, registration alone would not constitute constructive notice.  *See* Appellee Br. at 24 n.6.[15]  Further, the language of the 2011 Termination itself belies Don's claim, as it states that he is the "author of, or *one of the authors* of [*Cathy's Clown*]."  R. 1-6 at PageID 31 (emphasis added).

Accordingly, we find that a genuine factual dispute exists as to whether Don expressly repudiated Phil's authorship of *Cathy's Clown*.

IV.

We **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

---

[15] The First Circuit has suggested that copyright registration could serve as constructive notice, *see Saenger Organization, Inc. v. Nationwide Ins. Licensing Associates, Inc.*, 119 F.3d 55, 66–67 (1st Cir. 1997), but other circuits have disapproved of this approach and treated it as dicta, *see, e.g.*, *Wilson*, 908 F.3d at 844; *Gaiman*, 360 F.3d at 655.  Indeed, Phil does not rely on this precedent.

———————————

**CONCURRENCE**

———————————

MURPHY, J., concurring.  The Copyright Act has a three-year statute of limitations for civil actions.  17 U.S.C. § 507(b).  When should this limitations period begin to run if a party claims to be a co-author or co-owner of a copyrighted work that is being exploited solely by another author or owner?  Following other circuits, we have held that this statute of limitations will bar a party's co-ownership "claim" if the party does not sue within three years of the other owner's "plain and express repudiation" of that purported co-ownership interest.  *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007); *Ritchie v. Williams*, 395 F.3d 283, 288 n.5 (6th Cir. 2005).  The litigants in this case agree that this plain-and-express-repudiation test extends to their dispute over "authorship."  Phil Everly thus had three years to sue from Don Everly's plain-and-express repudiation of Phil's authorship interest in *Cathy's Clown*.  If Phil did not, he forever lost the ability to assert any authorship rights, including the termination rights his successors now seek to invoke.  I join the court's opinion because it faithfully follows our current precedent and because a fact dispute exists over whether Don plainly and expressly repudiated Phil's authorship interest in the song.  I write separately to express doubt over whether our test is the right way to think about the start date for this statute of limitations.

The Copyright Act's statute of limitations provides: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  I see two problems with our plain-and-express-repudiation test under this statutory language: (1) the test triggers the limitations period when a plaintiff has knowledge of a repudiation, not when a cause of action has "accrued," and (2) the test treats copyright ownership or authorship as a complete "claim," not as a legal element of a separate claim.

1. Courts usually choose between two rules to determine the start date for a statute of limitations.  The first (call it the "occurrence rule") begins the limitations period on the date that a violation of the plaintiff's legal right has occurred.  This date typically matches the first day the

plaintiff could assert a cause of action for that violation in court.  The second (call it the "discovery rule") begins later.  It starts the limitations period on the date that the plaintiff discovered or should have discovered that cause of action.  *Compare Foudy v. Miami-Dade County*, 823 F.3d 590, 593–94 (11th Cir. 2016), *with G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 613 (3d Cir. 2015).

Courts have waffled over which of these rules supplies the default start date. Historically, courts used the occurrence rule: "Absent other indication, a statute of limitations begins to run at the time the plaintiff 'has the right to apply to the court for relief[.]'" *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring in the judgment) (quoting 1 H.G. Wood, *Limitation of Actions* § 122a, at 684 (4th ed. 1916)); *see, e.g.*, *Clark v. Iowa City*, 87 U.S. 583, 589 (1875).  In the last few decades, though, circuit courts began switching to the discovery rule to identify the presumed start date for federal statutes of limitations.  *See McDonough v. Anoka*, 799 F.3d 931, 940 (8th Cir. 2015) (citing cases).  The Supreme Court has since squelched this circuit evolution in decisions spanning many federal statutes, criticizing the "expansive approach to the discovery rule [as] a 'bad wine of recent vintage.'" *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (citation omitted).  The Court has instead reaffirmed "that Congress legislates against the 'standard rule that the limitations period commences when the plaintiff has a complete and present cause of action,'" not when the plaintiff learns of that cause of action.  *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418 (2005) (citation omitted).

Applying these principles here, I read the Copyright Act's statute of limitations as adopting an occurrence rule, not a discovery rule.  As in any statutory context, we must start with the plain text.  *Rotkiske*, 140 S. Ct. at 360.  And the statute's "accrued" language had a well-known "legal meaning" in 1957 when Congress passed it.  17 U.S.C. § 507(b); Antonin Scalia & Bryan Garner, *Reading Law* 73 (2012); *see* Act of Sept. 7, 1957, Pub. L. No. 85-313, 71 Stat. 633.  That word choice shows that the limitations period begins to run when the cause of action "comes into existence" or "when a suit may be maintained" on the cause of action, not when a plaintiff later discovers the cause of action.  *Ballentine's Law Dictionary* 14 (3d ed. 1969) (defining "accrue" for purposes of a cause of action); *Black's Law Dictionary* 37 (4th ed. 1951)

(same).  A 1916 treatise, for example, used the word "accrue" in precisely this way, noting that "[t]he time when a cause of action has accrued within the statute[] of limitations means the time when plaintiff first became entitled to sue."  Wood, *supra*, § 122a, at 684–85.

The Supreme Court has regularly used the term in this fashion too.  When interpreting similar statutory text a few years before 1957, the Court noted that "[i]n common parlance a right accrues when it comes into existence[.]"  *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) (quoting *United States v. Lindsay*, 346 U.S. 568, 569 (1954)).  When interpreting a state statute of limitations, the Court again explained that the "usual meaning" of the phrase "the date the cause of action thereon accrued" referred "to the time when suit may be instituted."  *Fisher v. Whiton*, 317 U.S. 217, 221 (1942) (citation omitted).  In a much later decision holding that the Copyright Act does not include an equitable "laches" defense (a defense of prejudicial delay), the Court reinforced this reading by equating "accrue" with "arise": "A copyright claim . . . arises or 'accrue[s]' when an infringing act occurs."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014).

Even if I am wrong that this text is unambiguous, the Supreme Court has also given us clear instructions about how to resolve any potential ambiguity.  When "there are two plausible constructions of a statute of limitations," we should generally "adopt the construction that starts the time limit running when the cause of action . . . accrues," not when the plaintiff discovers the cause of action.  *Rotkiske*, 140 S. Ct. at 360 (citation omitted).  Here, the Copyright Act's statute of limitations can at least plausibly be read to use an occurrence rule.  That should end the matter.

I recognize that my view is a minority position, to put it mildly.  "The overwhelming majority of courts," including our own, "use discovery accrual in copyright cases."  *Petrella*, 572 U.S. at 670 n.4 (citation omitted); *Roger Miller*, 477 F.3d at 390.  But the Supreme Court has twice cautioned that it has "not passed on the question."  *Petrella*, 572 U.S. at 670 n.4; *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 962 (2017).  And most of these decisions merely cite other decisions; they pay little attention to the statutory text or the Supreme Court's precedent.  In an oft-cited example, the Ninth Circuit adopted the discovery rule in an unreasoned sentence, relying on a district-court decision addressing the use

of fraudulent concealment to toll a statute of limitations. *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994) (citing *Wood v. Santa Barbara Chambers of Commerce, Inc.*, 507 F. Supp. 1128, 1135 (D. Nev. 1980)). But a narrow equitable doctrine predicated on fraud says nothing about whether to adopt a broad discovery rule. *See Rotkiske*, 140 S. Ct. at 361.

A Third Circuit decision offers the best counterpoint. *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433–37 (3d Cir. 2009). The Copyright Act's criminal statute of limitations uses the phrase "cause of action arose," but its civil statute of limitations uses the phrase "claim accrued." 17 U.S.C. § 507(a)–(b). Since courts assume Congress intends different meanings with different language, the Third Circuit found that the criminal statute adopts an occurrence rule and the civil statute adopts a discovery rule. *Graham*, 568 F.3d at 434–35. As support, the court compared a Supreme Court case that adopted an occurrence rule for a statute using the verb "arise," *McMahon v. United States*, 342 U.S. 25 (1951), with another case that adopted the discovery rule for a statute using the verb "accrue," *Urie v. Thompson*, 337 U.S. 163 (1949). *Graham*, 568 F.3d at 434–35.

These valid points do not change my mind. The canon that different words have different meanings "is 'no more than a rule of thumb' that can tip the scales when a statute could be read in multiple ways." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) (citation and alterations omitted); Scalia & Garner, *supra*, at 170. Here, the plain meaning of "accrue" triggers the occurrence rule—as the Supreme Court has repeatedly said. *See Gabelli*, 568 U.S. at 448; *Lindsay*, 346 U.S. at 569; *Fisher*, 317 U.S. at 221. *Urie* does not prove the contrary. That case did not rely on the word "accrue" to adopt a discovery rule; it relied on the "humane" purposes of the Federal Employers' Liability Act. 337 U.S. at 170; *see TRW*, 534 U.S. at 27. The Court has since rejected the same humanitarian departure from text when interpreting the Fair Debt Collection Practices Act's statute of limitations. *See Rotkiske*, 140 S. Ct. at 360–61. I fail to see how the Copyright Act could justify *Urie*'s policy-based adoption of a discovery rule if the Fair Debt Collection Practices Act (with its admittedly different language) did not. The Third Circuit also relied on the short-lived circuit presumption that, "in the absence of a contrary directive from Congress, we apply the federal discovery rule." *Graham*, 568 F.3d at 434 (internal quotation marks and alterations omitted). Yet the Supreme Court has now flatly

rejected this presumption in favor of the opposite one—that a statute adopts an occurrence rule. *Rotkiske*, 140 S. Ct. at 360.  Even if the different language across the criminal and civil statutes created ambiguity, therefore, I would resolve the ambiguity the way the Supreme Court has told us to.

My view that the statute of limitations adopts an occurrence rule leads me to doubt our plain-and-express-repudiation test.  That test does not apply an occurrence rule asking whether the defendant has violated a legal right triggering the plaintiff's ability to seek relief in court. It applies a discovery rule asking whether the plaintiff knew of the defendant's rejection of the plaintiff's co-owner status.  *See, e.g.*, *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011). Indeed, early decisions adopting this test relied on the general discovery rule to do so, noting that "[a] cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised." *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996); *accord Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004).  And when applying this test, we have found that the limitations period started on the date that one owner sent his alleged co-owners a letter (i.e., the date they received notice), even though this act of sending a letter did not itself violate any legal right of the co-owners. *See Ritchie*, 395 F.3d at 288 & n.5.  As *Ritchie* shows, this line of caselaw also focuses on a plaintiff's knowledge of *repudiation*. *Id.*  Even under the discovery rule, however, a plaintiff typically must know of a currently cognizable *cause of action*.  That brings me to my second concern with the plain-and-express-repudiation test.

2. Under the occurrence rule, a statute of limitations begins only when a plaintiff "has a *complete and present* cause of action" (whatever the plaintiff's knowledge). *Petrella*, 572 U.S. at 670 (citation omitted; emphasis added).  The limitations period thus has not begun when a plaintiff cannot assert a claim in court because one of the claim's required legal elements has yet to transpire.  *See McDonough v. Smith*, 139 S. Ct. 2149, 2155–56 (2019).  Instead, the defendant's conduct must "ripen into a cause of action" that a plaintiff may immediately litigate. *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 202 (1997).  If the rule were otherwise—if the statute of limitations began to run before a plaintiff could sue—the time limit could expire before the claim arose. *Graham Cty.*, 545 U.S. at 418.

Consider two examples. Title VII bars an employer from constructively discharging an employee for a discriminatory reason. A constructive-discharge claim "has two basic elements": (1) an employer must engage in such intolerable discriminatory conduct that a reasonable person would feel compelled to resign and (2) the employee must actually resign. *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016). Does an employee have a constructive-discharge claim if the employee has suffered the intolerable conditions but has yet to resign? No, the Supreme Court has held that the statute of limitations does not begin until that resignation. *Id.*; *see also Bay Area*, 522 U.S. at 201–02. Or take a classic negligence claim. As "every first-year law student" learns, it has four legal elements: duty, breach, causation, and damages. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). Does a plaintiff have a negligence claim when the defendant breaches a duty owed to the plaintiff if that breach has yet to cause an injury? No, courts generally hold that such a breach does not ripen into a claim until some injury (even if modest) occurs. *See Cantu v. Schmidt* (*In re Cantu*), 784 F.3d 253, 258 (5th Cir. 2015); *Snyder v. Town Insulation, Inc.*, 615 N.E.2d 999, 1000–01 (N.Y. 1993); *Misitis v. Steel City Piping Co.*, 272 A.2d 883, 884 n.1 (Pa. 1971); *Skoglund v. Minneapolis, St. Ry. Co.*, 47 N.W. 1071, 1072 (Minn. 1891).

These principles show the right questions to ask in this copyright context: Is a party's status as a copyright co-author or co-owner a "complete and present" claim that the party may immediately pursue in court (like a negligence claim)? *Petrella*, 572 U.S. at 670 (citation omitted). Or is a party's status as a co-author or co-owner an element of a claim that must fully develop before the party may sue (like the breach element of a negligence claim)? Current caselaw treats this authorship or ownership status as an "element" in the context of an owner's suit against an *infringing party*, but as a "claim" in the context of a co-owner's suit against *another owner*. I tend to think that courts should treat a party's authorship or ownership status as an element across the board. That view would mean that this status is not a "claim" and does not, by itself, trigger the statute of limitations in either of these two contexts. I will discuss them in turn.

*Infringement Suits*. The rules are easy in the infringement context. There, the caselaw treats "ownership" as an element of a claim under 17 U.S.C. § 501. "To establish infringement,"

the Supreme Court has held, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Severe Records, LLC v. Rich*, 658 F.3d 571, 579 (6th Cir. 2011). Two aspects of this test stand out here. For one thing, a party's ownership status does not trigger the statute of limitations because, as an element, it does not cause a completed "claim" to "accrue." 17 U.S.C. § 507(b). A "complete and present" claim arises only "when an infringing act" of copying "occurs." *Petrella*, 572 U.S. at 670 (citation omitted). For another, each act of "copying" qualifies as a separate "claim" under the statute of limitations' "separate-accrual rule." *Id.* at 671. A defendant who makes an infringing copy once a week generates a new "claim" each week that triggers a distinct start date under the statute of limitations. *Id.* In the statute's words, "[e]ach wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs." *Id.*

May an infringing party nonetheless cut off all future liability by sending a copyright owner a "plain-and-express repudiation" of the owner's ownership status, hoping that the owner does not get around to suing within three years of that repudiation? No, the statute of limitations would not begin to run from the date of the *repudiation* (no matter how "plain and express"); it would begin to run from the date of the completed *claim*—the act of copying in violation of § 501. *Petrella*, 572 U.S. at 671–72. And even if the repudiation were itself an infringing act of copying, the statute of limitations would not impose a bar on later claims of infringement. If the infringer has engaged "in a series of discrete infringing acts, the copyright holder's suit ordinarily [would] be timely . . . with respect to more recent acts of infringement (i.e., acts within the three-year window), but untimely with respect to prior acts of the same" kind. *Id.* at 672. For timely infringement claims falling within the three-year window, an infringer could, of course, dispute the "ownership" element of the claims. But the statute of limitations would impose no outright ban on them.

Suppose that, after the infringer sent its repudiation, the owner could have sued the infringer for a declaration that it was a valid owner. If that repudiation created a concrete "case of actual controversy" within the meaning of the Declaratory Judgment Act, would it then start the statute of limitations on an infringement claim? 28 U.S.C. § 2201(a). No, the availability of

a declaratory remedy would also not make an infringement "claim" "accrue." The declaratory-judgment remedy exists so that "[t]he parties can have their rights declared . . . *before a claim has accrued*," Restatement (Second) of Judgments § 33 cmt. a (1982) (emphasis added), and before their controversy has "ripen[ed] into *violations of law*," 10B Charles A. Wright et al., *Federal Practice and Procedure* § 2751, at 429 (2016) (emphasis added). In other words, "no 'injury' or 'wrong' need have been actually committed . . . to enable the plaintiff to invoke the judicial process[.]" Edwin Borchard, *Declaratory Judgments* 25 (1934); *see Steffel v. Thompson*, 415 U.S. 452, 478 (1974) (Rehnquist, J., concurring). A patent licensee, for example, may seek a declaration that a patent is invalid, permitting it to stop paying royalties to a patent owner under their contract, without first refusing to pay and risking the accrual of a breach-of-contract claim. *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128, 137 (2007). But the availability of this declaratory relief would not start the statute-of-limitations clock on the patent owner's contract claim; that suit would not accrue until the licensee took "the final step" of not paying royalties (establishing the claim's breach element). *Id.* at 128; *see Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992); *cf. Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 846–47 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011).

*Suits Between Co-Owners*. These rules get turned upside down when we move from the infringement context to the context of suits between purported co-owners or co-authors. There, the caselaw treats "ownership" or "authorship" as a claim, not an element. *Roger Miller*, 477 F.3d at 389–90. And it holds that an owner's plain-and-express repudiation of the alleged co-owner's ownership status makes an ownership "claim" "accrue," barring the co-owner from asserting any legal rights in the copyright after three years. *Id.*; *Zuill*, 80 F.3d at 1371.

The basis for this distinction between infringement and ownership escapes me. As one commentator has suggested, the distinction "is artificial: there is no justification derived from the text of the statute, the legislative history, or the policies of the Copyright Act for treating continuing claims of authorship any differently than continuing acts of infringement." 6 William F. Patry, *Patry on Copyright* § 20:37, Westlaw (database updated Mar. 2020). In both contexts, courts "should not deem the statute of limitations to start running until [a] claim has matured to the point of being legally cognizable." 3 Melville B. Nimmer and David Nimmer, *Nimmer on*

*Copyright* § 12.05[C][1], LEXIS (database updated 2020). And I do not think one owner's notice disputing another's ownership interest suffices to create a "complete and present" claim in this ownership context. *Petrella*, 572 U.S. at 670 (citation omitted). If a plain-and-express repudiation sufficed, why wouldn't an identical notice from an infringing party also create a "claim," thereby requiring an owner to sue the infringer within three years or be forever barred from challenging later acts of infringement? As I have said, that is not the law. *See id.* at 670–71. And I remain unconvinced by the courts' three current rationales for distinguishing these two contexts.

Rationale One: Courts sometimes distinguish infringement claims from these ownership "claims" on the ground that "[a]n infringement occurs every time the copyrighted work is published, but creation does not." *Zuill*, 80 F.3d at 1371; *Merchant*, 92 F.3d at 56. But no claim immediately "accrues" upon a copyright's creation; otherwise, all owners would have to file quiet-title actions against the world within three years of their creations. *See* 6 Patry, *supra*, § 20:37. Under this view, moreover, the three-year statute of limitations should have long run on *Don's* claim to sole-author status because *Phil* conspicuously acted like a co-author for the first 20 years after the creation of *Cathy's Clown*.

Rationale Two: Courts also base this distinction on the ground that infringement suits are often against an "unknown third party" whereas suits between putative co-owners are typically between parties in "close relationships." *Ritchie*, 395 F.3d at 288 n.5; *Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1255–57 (9th Cir. 2013). True enough. But what relevance does this factual distinction have for the legal question about when a "claim" "accrues"? And how do we go about deciding whether the suit is with a "close" party so as to trigger the one rule or an "unknown" party so as to trigger the other? I see nothing in the statute that makes this distinction matter or that answers how to distinguish between the two types of suits.

Rationale Three: Courts lastly justify these ownership "claims" with the Declaratory Judgment Act. A repudiation of ownership can create a "case of actual controversy" under 28 U.S.C. § 2201(a) and trigger a party's ability to seek declaratory relief. Courts reason that this "claim for a declaratory judgment" accrues on repudiation, thereby triggering the three-year

clock. *Zuill*, 80 F.3d at 1371; *Merchant*, 92 F.3d at 56. Yet a declaration is a remedy, not a claim, and its main benefit is to allow parties to learn their rights "before a claim has accrued." Restatement (Second) of Judgments § 33 cmt. a. Elsewhere, therefore, courts typically find that the start of a limitations period for declaratory relief depends on the start of the limitations period for the matching coercive remedy (like damages). "Because a declaratory judgment action is a procedural device used to vindicate substantive rights, it is time-barred only if relief on a direct claim would also be barred." *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997) (quoting *Stone*, 970 F.2d at 1048); *Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126 F.3d 178, 181 (3d Cir. 1997) (citing cases). The rule could hardly be different because courts have broad discretion over whether even to "entertain an action under the Declaratory Judgment Act." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); 10B Wright, *supra*, § 2759. Yet courts follow the opposite rule in this copyright context. An otherwise timely damages claim for an alleged infringement will be barred if the statute of limitations has run on the "claim" for a declaration of ownership because "the first element of an infringement claim is ownership by the plaintiff." *Ritchie*, 395 F.3d at 288 n.5; *Seven Arts*, 733 F.3d at 1255. It is not clear to me why the "direct claim" for damages should take a backseat to the discretionary claim for a declaration in this context and no other. *Int'l Ass'n of Machinists*, 108 F.3d at 668 (citation omitted).

For these reasons, I remain unconvinced by the plain-and-express-repudiation test. I must confess doubt, though, over when this sort of "claim" does "accrue" under the statute of limitations. Consider a few possibilities. Perhaps an analogy to the infringement context sheds light on the question. There, a claim accrues when the defendant violates the owner's legal rights with the "infringing act" of copying. *Petrella*, 572 U.S. at 670. What is the act that one owner could take against a co-owner that would be analogous to this "infringing act"? Most often, it would be an owner's refusal to turn over a share of the "royalty payments" to which the co-owner claims an entitlement. *Stone*, 970 F.2d at 1048; *see Gaiman*, 360 F.3d at 652; *Goodman v. Lee*, 78 F.3d 1007, 1012 (5th Cir. 1996). Here, for example, Phil's successors have a "claim" to half the income earned from *Cathy's Clown* after they exercised his termination rights. Just as each infringing act of "copying" creates a new claim, each time an owner fails to turn over income earned might lead to a distinct "claim" subject to a distinct three-year window.

*Petrella*, 572 U.S. at 671. After all, the separate-accrual rule means that "[e]ach wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs." *Id.*; *cf. Clark*, 87 U.S. at 590. And as long as that claim is timely, a request for declaratory relief should be too. *See Int'l Ass'n of Machinists*, 108 F.3d at 668.

Yet this infringement analogy frays when one asks what the co-owner's "cause of action" would be to recover this income. In the infringement context this cause-of-action question has a ready answer—a claim under 17 U.S.C. § 501(b). In this context, a putative co-owner may not seek a share of the income using § 501(b) because two undisputed co-owners cannot sue each other for infringement. *Severe*, 658 F.3d at 582. Instead, when no contract governs the parties' relationship (as will usually be the case in suits like this), a co-owner likely must pursue an equitable claim for a "division of the profits." *Gaiman*, 360 F.3d at 652 (seeking "accounting"); *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG.*, 510 F.3d 77, 81 (1st Cir. 2002); *Goodman*, 78 F.3d at 1012; *Merchant*, 92 F.3d at 56; *Stone*, 970 F.2d at 1048. But this equitable claim arises under *state* law. As Judge Friendly recognized, a contractual or equitable cause of action between copyright co-owners is a "'state-created' claim" owing its existence to state law, not the Copyright Act. *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964); 2 Patry, *supra*, § 5:9. Perhaps this fact means that the Copyright Act's statute of limitations should simply fall out of the picture and the relevant state statute of limitations should apply. *See Goodman*, 78 F.3d at 1013; *cf. Gaiman*, 360 F.3d at 652.

One last wrinkle. When this *state-law* claim for copyright income hinges on a party's "status as a co-author," the claim includes a legal element raising a *federal* question about the meaning of "author" under the Copyright Act. 3 Nimmer and Nimmer, *supra*, § 12.01[A][1][b]; 17 U.S.C. § 201(a); *Gaiman*, 360 F.3d at 652. That is why courts may exercise federal-question jurisdiction over suits under the Declaratory Judgment Act seeking declarations of ownership. "Even though state law creates [a party's] cause[] of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 13 (1983). As Judge Friendly also noted in this context, "an action 'arises under' the Copyright Act if . . . the complaint . . .

asserts a claim requiring construction of the Act." *Eliscu*, 339 F.2d at 828. So most courts hold that federal-question jurisdiction exists to consider suits seeking declarations of ownership and that jurisdiction also exists over the state-law claims in which this federal question is embedded. *See Cambridge*, 510 F.3d at 86 (citing cases). As I see it, though, this federal "ownership" element of a state-law claim might not create a federal "claim." Perhaps then the Copyright Act's statute of limitations should apply because the "civil action" is "maintained under the provisions of [the Copyright Act]," but the state-law accrual rules should apply because the "claim" that has "accrued" is one under state law. 17 U.S.C. § 507(b).

I am sure there are other possibilities and leave these difficult questions for another day. For now, I simply predict that the Supreme Court may one day hold that the plain text of the Copyright Act's statute of limitations contains an occurrence rule, not a discovery rule. And that change will likely require courts to reassess their plain-and-express-repudiation tests, which have long followed a discovery-rule model.

* * *

"When some law-making bodies 'get into grooves,' Judge Learned Hand used to say, 'God save' the poor soul tasked with 'get[ting] them out.'" *United States v. Jeffries*, 692 F.3d 473, 486 (6th Cir. 2012) (Sutton, J., dubitante) (quoting Learned Hand, *The Spirit of Liberty* 241–42 (2d ed. 1954)). I fear the courts may have gotten into such a "groove" in this copyright context.

———————————

**DISSENT**

———————————

RALPH B. GUY, JR., Circuit Judge, dissenting. It is important to separate the genuine dispute that exists about whether Don Everly and Phil Everly were, in fact, co-authors of *Cathy's Clown* from the question of whether claims arising out of that dispute were filed timely. Whatever the truth on the merits—the story they told for the first twenty years after the song's creation or the one they told for the last twenty years before Phil's death—no reasonable jury could conclude other than that Don expressly repudiated Phil's claim of co-authorship more than three years before this action was commenced in November 2017. For that reason, I would affirm the judgment of the district court.

"[A] determination of copyright ownership based on a disputed allegation of co-authorship presents a federal question that arises under, and must be determined according to, the Copyright Act." *Severe Records, LLC v. Rich*, 658 F.3d 571, 582 (6th Cir. 2011) (citation omitted). No civil action may be maintained under the Copyright Act "unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A "number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'" *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (citation omitted). And, as is relevant here, we have said such a claim is barred three years after a plain and express repudiation of authorship. *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007).

Express repudiation may occur in different ways—privately, publicly, or implicitly—but the majority rightly concludes that Don's 2011 Notice of Termination would not be one. *See Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 118-20 (2d Cir. 2018) ("at least three types of events [] can put a potential plaintiff on notice and thereby trigger the accrual of an ownership claim"); *Wilson v. Dynatone Publ'g Co.*, 908 F.3d 843, 844-45 (2nd Cir. 2018) (rejecting claim that "registration, without more, triggers accrual of an ownership claim"). Yet, it also does not undermine a finding of express repudiation because the statement that Don was an "author or one of the authors, of the Works" appears in the cover letter that pertained to 24 compositions—only

one of which was *Cathy's Clown*. Indeed, I would conclude that Phil's co-authorship was plainly and expressly repudiated by Don's actions well before then.

Don and Phil were consistently identified as co-authors of *Cathy's Clown* from shortly after its creation in 1960 until 1980. That is, Don and Phil were identified as co-composers in the agreement transferring 100% ownership of the worldwide copyright to their publisher on March 21, 1960; were listed as co-authors in the registration of that copyright on April 14, 1960; were credited as co-authors by BMI in connection with awards in 1961 (Pop Award) and 1972 (R&B Award); and received credit as co-authors and shared equally in songwriter royalties for copies distributed between 1960 and 1980. And, during a 1972 interview on the David Frost Show, Don said "*Cathy's Clown* was written together," and Phil proceeded to describe how that had happened. Phil said Don had written most of the song before calling him to come to his house, where Phil listened to it and wrote some verses for it. The Everly Brothers broke up not long after that in 1973.

But, to hear Don tell it, he "let" Phil take credit as a co-composer on 17 songs—including *Cathy's Clown*—that he actually wrote alone between 1956 and 1960. Don said he did so to improve their chances of success, but finally decided to "set the record straight" once Phil had success on his own with Linda Ronstadt's recording of *When Will I Be Loved*. Don testified that he wrote a letter to Phil demanding that Phil acknowledge him as the sole author of *Cathy's Clown*. Don did not keep a copy of that letter, and we can't ask Phil whether he received it.

For their part, Phil's heirs also claim that Don demanded that Phil give up credit for *Cathy's Clown*—only they say the demand was made in a bullying phone call sometime in 1980. A witness to that call—bass player Joey Paige—testified that he heard Phil say, "How can you do this to me?" and "You know I wrote half that song." Paige added that Phil said he was going to "give it back" because he was tired of fighting with Don. Also, according to Phil's widow Patti, Phil told her that he "no longer had credit as a writer" of *Cathy's Clown* because Don had "demanded that he take his name off." Don denied making the call. He also stated that had no recollection of making such a call, but if he did, "it was a follow up to the letter [he] had sent." As I see it, there is a dispute as to *how* but not *whether* Don made a demand that Phil acquiesce in Don's claim of sole authorship of *Cathy's Clown*.

Don's demand led Phil to execute the Release and Assignment covering *Cathy's Clown* on June 10, 1980.  I agree with the majority that a reasonable juror could find that the Release "is evidence that Don challenged Phil's status as an author." (Maj. Op., p. 22.)  Phil's heirs conflate the fact that the Release could not transfer authorship with the question of repudiation.  They contend that the Release transferred Phil's right to receive "the benefits of authorship," which it certainly did.  But the Release also stated that Phil released to Don "all of his rights, interests and claim in and to said compositions, including rights to royalties *and his claim as co-composer*." (Emphasis added.)  And, it stated that it included not only Phil's "right to royalties and other income arising out of the said compositions from and after the effective date, *but also every claim of every nature by him as to the composition of said songs*." (Emphasis added.)  Although the Release could not transfer authorship, Phil's written disavowal of his rights as a co-composer is evidence that Don had made a demand that challenged Phil's co-authorship of *Cathy's Clown*.

The only countervailing evidence is that, in 1984, Don repeated the original co-creation story during an interview on *Rock 'N' Roll Odyssey.*  A 1984 biography also included Phil's claim to have co-written *Cathy's Clown*.  To the extent that these statements arguably muddy the waters, they cannot overcome the public repudiation that accompanied the subsequent release of Reba McEntire's cover of *Cathy's Clown*.  Don received credit as the sole author on the record, sheet music, and press materials, and accepted a BMI award in 1990 as the sole author of *Cathy's Clown*.  Phil's son, Jason, testified that Phil knew about the 1990 BMI award and bemoaned the loss of his "prized possession."  But Phil did not do anything about it before he died in 2014.

Phil's heirs nonetheless say there was no express repudiation because Phil had simply agreed to pretend not to be a co-author (*i.e.*, voluntarily transferred his right to receive public credit as an author).  Even if there was evidence of such an agreement, it cannot be the case that one can avoid the accrual of a claim based on a dispute over co-authorship by agreeing to give up the right to claim to be a co-author.  Because no reasonable juror could conclude other than that Don plainly and expressly repudiated Phil's co-authorship of *Cathy's Clown* more than three years before this action was commenced, I respectfully dissent.